Bunny KISHABA, Plaintiff,

v.

HILTON HOTELS CORP., et al., Defendants.

Civ. No. 87–0840 ACK.

United States District Court, D. Hawaii.

Feb. 16, 1990.

Findings of Fact and Conclusions of Law and Order April 10, 1990.

Howard Green, Michael A. Lilly, Green Ning Lilly & Jones, Honolulu, Hawaii, for plaintiff.

Robert Katz, Sabrina Toma, Torkildson Katz Jossem Fonseca & Moore, Honolulu, Hawaii, for defendants.

## DECISION

KAY, District Judge.

Plaintiff Bunny Kishaba claims she was constructively discharged by Defendants Hilton Hotels Corporation, dba Hilton Hawaiian Village ("Hilton"), and Earl McDonough because of her Asian race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (1978) ("Title VII") (Paragraph 37, First Amended Complaint).

After reviewing all the evidence, arguments and memoranda of the parties, it is the decision of this Court that Plaintiff Kishaba has failed to establish either race discrimination or a continuous pattern of conduct that rendered her work environment so intolerable and discriminatory that a reasonable person in the same position would have felt forced to quit. While McDonough may have been abrupt and treated employees poorly, there is no evidence that the Defendants treated any employee less favorably than others because of his or her race. In fact, in some ways McDonough gave Plaintiff more preferential treatment than other secretaries. In particular, Plaintiff has not shown that there existed aggravating factors such as a pattern or practice of disparate treatment and that any such treatment was racially premised. Plaintiff has failed to prove she was subjected to different or abusive working conditions because of her Asian race. In viewing the demeanor and testimony of all witnesses, as well as the other evidence, this Court finds that Plaintiff's testimony is not as credible as that of Defendants' witnesses. The Court concludes that there was no constructive discharge nor violation of Title VII.

This Court finds that Plaintiff's longtime and loyal employment with Hilton was tragically ended by Plaintiff's decision to resign as the result of her supersensitivity over the hiring of a second secretary to service McDonough, for which there were legitimate, non-discriminatory business reasons, and in her mistaken belief that McDonough had pulled her file in furtherance of some plan to fire her.

In view of this Court's decision, the motions for dismissal of McDonough and concerning *respondeat superior* are moot.

TITLE VII

Section 703(a) of Title VII, provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a).

Plaintiff in the instant action has argued that Defendants treated her in a discriminatory manner because of her Asian race. She has proceeded, therefore, under a "disparate treatment" theory of Title VII liability. The disparate treatment theory, as distinguished from a "disparate impact" approach, applies where an employer has treated some person less favorably than others because of his or her race, color, religion, sex, or national origin. See *International Bro. of Teamsters v. United States,* 431 U.S. 324, 334–343, 97 S.Ct. 1843, 1854–859, 52 L.Ed.2d 396 (1977). In a disparate treatment case, "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.* at 335 n. 15, 97 S.Ct. at 1854–855 n. 15 (1977); *see also, Gay v. Waiters' and Dairy Lunchmen's Union,* 694 F.2d 531, 537 (9th Cir.1982) ("By their very nature, these claims [disparate racial treatment] require proof of intentional discrimination.") In *United States Postal Service v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the Supreme Court stated:

> The "factual inquiry" in a Title VII case is "[whether] the defendant intentionally discriminated against the plaintiff." (cite) In other words, is "the employer ... treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1482.

The *Teamsters* Court established a two-prong analysis for disparate treatment cases. The Title VII plaintiff must establish (i) that there existed at the place of employment a "pattern or practice" of disparate treatment and, (ii) that such disparate treatment was "racially premised." *Teamsters,* 431 U.S. at 335, 97 S.Ct. at 1854.

### Indirect Evidence of Discrimination

█ As in any lawsuit, a Title VII plaintiff may rely upon either direct or circumstantial evidence to prove his case. Accordingly, intentional discrimination under a disparate treatment theory may be demonstrated through either direct or indirect, *i.e.,* "circumstantial," evidence. *Aikens,* 460 U.S. at 714 n. 3, 103 S.Ct. at 1481 n. 3. The trier of fact, therefore, "should consider all the evidence, giving it whatever weight and credence it deserves." *Ibid.* By "direct evidence" is meant that evidence which, if believed, establishes the existence of a fact in issue without reliance upon inference or presumption. Black's Law Dictionary, 413–14 (5th ed. 1979). By "circumstantial" or "indirect" evidence is meant evidence which, if believed, establishes the existence of a fact not directly proved through the medium of inferences drawn from those facts that *are* directly proved. *Id.* at 221. As applied to the instant case, therefore, direct evidence is evidence which, if believed, establishes discrimination without the need for further inference or presumption, whereas indirect evidence is evidence which, if believed, requires further inference from such evidence to establish discrimination.

The landmark case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), created a series of shifting burdens of proof which is applicable to Title VII actions based upon either direct or indirect evidence. Plaintiff mistakenly assumes that *McDonnell Douglas* is inapplicable to a Title VII action involving direct proof of discrimination. What the Supreme Court actually prescribed is that "the *McDonnell Douglas* formula does not *require* direct proof of discrimination." *Aikens,* 460 U.S. at 714, n. 3, 103 S.Ct. at 1481, n. 3, *quoting, Teamsters,* 431 U.S. at 358, n. 44, 97 S.Ct. at 1866, n. 44 (emphasis added). It is ap-

parent, however, that the Eleventh Circuit has distinguished Title VII actions involving direct evidence of discrimination from those involving indirect evidence by requiring a variation of the *McDonnell Douglas* analysis. That variation is discussed below.

■ Under standard *McDonnell Douglas* analysis, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Teamsters*, 431 U.S. at 335–36, 97 S.Ct. at 1854–855; *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Gay v. Waiters' and Dairy Lunchmen's Union*, 694 F.2d 531, 538 (9th Cir.1982) ("This initial burden of production ... is met upon a 'showing of actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such action was based upon' race or another impermissible criterion.") Although *McDonnell Douglas* articulated a four-factor formula specific to the issue of discriminatory hiring, Plaintiff's threshold burden of proving a prima facie case of discrimination may be discharged by "an alternative presentation of evidence supporting an inference of discrimination." *Gay*, 694 F.2d at 538; *see also, Diaz v. American Telephone and Telegraph*, 752 F.2d 1356, 1361 (9th Cir.1985); *Fragante v. City and County of Honolulu*, 888 F.2d 591, 595 (9th Cir.1989). Thus, while the *McDonnell Douglas'* four-factor formula of discriminatory hiring is not required, the shifting burden of proof analysis is most commonly followed. *Diaz*, 752 F.2d at 1361. And the burden of establishing a prima facie case is not designed to be "onerous." *Id.*

By successfully establishing a prima facie case of discrimination, the Title VII plaintiff thereby creates a "rebuttable 'presumption that the employer unlawfully discriminated against' him." *Aikens*, 460 U.S. at 714, 103 S.Ct. at 1481. If the plaintiff is successful in establishing his prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the allegedly discriminatory

action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) ("*Burdine*"), quoting, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). Finally, if the employer successfully rebuts the plaintiff's prima facie showing of discrimination, the burden shifts back to the plaintiff to prove by a preponderance of the evidence "that the employer's purported reason for non-selection was 'a pretext for invidious discrimination.'" *Fragante*, 888 F.2d at 595, quoting, *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–094. It is at this stage, however, that the rebuttable presumption established by the plaintiff's prima facie case "drops from the case" and "'the factual inquiry proceeds to a new level of specificity.'" *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1482, quoting, *Burdine*, 450 U.S. at 255, n. 10, 101 S.Ct. at 1095, n. 10. The Supreme Court clarified the impact of these shifting burdens of proof:

> The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Burdine*, 450 U.S. at 253 [101 S.Ct. at 1093]; *see also, Gay*, 694 F.2d at 537 ("The plaintiff in a Title VII disparate treatment case, like most civil plaintiffs, bears the ultimate burden of persuasion on the issue of discriminatory intent.")

Where a plaintiff alleges a pattern or practice of disparate treatment,

> [The plaintiff must] prove more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts.... [he must] establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure. *Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855.

A "pattern or practice" exists where a "company repeatedly and regularly engaged in acts prohibited by the statute. * * * The point is that single, insignificant, isolated acts of discrimination by a single business would not justify a finding of a pattern or practice." *Teamsters*, 431 U.S.

at 336 n. 16, 97 S.Ct. at 1855 n. 16, *quoting with approval,* 110 Cong.Rec. 14270 (1964).

Plaintiff in the instant case has offered statistical evidence in support of her contention that Defendants regularly engaged in racial discrimination. Statistical evidence may be relevant in a Title VII disparate treatment case to establish a general discriminatory pattern in an employer's hiring or promotion practices which would in turn be probative of the employer's motive relevant to an inference of discriminatory intent regarding an employment decision at issue. *Diaz,* 752 F.2d at 1363. Nevertheless, Plaintiff's statistical evidence is of no probative value in the instant case because the analysis of Plaintiff's statistician erroneously categorized Plaintiff as an "official and manager" and was otherwise flawed.

Plaintiff has failed to meet even her threshold burden of establishing, by a preponderance of the evidence, a prima facie case of discrimination through reliance upon either direct or indirect evidence. As a result, Plaintiff has failed to establish a rebuttable presumption that the employer unlawfully discriminated against her. Accordingly, there is no shift of the burden to the employer to articulate some legitimate, nondiscriminatory reason for the alleged discriminatory action and this Court must hold that Plaintiff has not succeeded in proving Title VII liability on the part of either Hilton or McDonough.[1]

### Direct Evidence of Discrimination

Plaintiff has argued that a *McDonnell Douglas* shifting burden analysis is not appropriate where there exists "direct evidence" of racial discrimination. In support of her theory she relies upon a series of

Eleventh Circuit cases that have in reality only modified the *McDonnell Douglas* analysis and have not, as Plaintiff has claimed, rejected the *McDonnell Douglas* analysis *in toto.* Moreover, as mentioned above, the *McDonnell Douglas* analysis is clearly *not* limited to only those Title VII actions wherein there exists only indirect evidence of discrimination; rather, *McDonnell Douglas* analysis is appropriate whether there exists direct evidence, indirect evidence, or some combination of the two.

Plaintiff places primary reliance upon the Eleventh Circuit decision in *Wilson v. City of Aliceville,* 779 F.2d 631 (11th Cir.1986). It will be remembered that the *McDonnell Douglas* analysis requires a three-stage shifting of burdens from the plaintiff to the defendant and back to the plaintiff. By successfully establishing a prima facie case of discrimination, the Title VII plaintiff creates a rebuttable presumption that the employer unlawfully discriminated against her. *Aikens,* 460 U.S. at 714, 103 S.Ct. at 1481. The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the alleged discriminatory action. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093, *quoting, McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. The defendant's burden is merely one of production—no proof of the alleged legitimate business reason is required. Finally, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reason proffered by the defendant was not its true reason, but was a mere pretext for discrimination. This analysis is appropriate whether there exists direct or indirect evidence of discrimination.

1. Plaintiff has mistakenly relied upon statements published in this Court's order of April 24, 1989, granting in part and denying in part Defendants' motion for summary judgment, as support for her contention that she has met her burden of establishing a prima facie case of discrimination. But when analyzing Defendant's motion for summary judgment, this Court followed black letter law requiring it to construe all evidence and inferences to be drawn therefrom in the light most favorable to Plaintiff. *See T.W. Elec. Services v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). For purposes of Defendants' motion for summary judgment, therefore, "[t]he evidence of the non-movant is to be believed." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–609, 26 L.Ed.2d 142 (1970). Accordingly, at the stage of a full trial on the merits, this Court is not bound by its prior assumptions of fact or conclusions of law drawn therefrom in a summary judgment motion where those assumptions were construed in the light most favorable to the non-moving party.

Under the *Wilson* modification, where the plaintiff has direct evidence of racial discrimination, the defendant may not rebut plaintiff's prima facie case, and the resultant rebuttable presumption of discrimination, by merely articulating a legitimate reason for its actions. *Wilson* requires the defendant to prove, by a preponderance of the evidence, that it would have made the same decision or pursued the same course of action even absent the "impermissible factor" of discrimination. *Wilson*, 779 F.2d at 634.

Plaintiff's argument for a different shifting of burdens in a case involving direct evidence of an impermissible motive receives some support from Justice O'Connor's concurring opinion in *Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), a mixed motives case. In her concurring opinion, Justice O'Connor argued that the burden of proof in a disparate treatment case should shift to the defendant only where the plaintiff has demonstrated by "direct evidence that an illegitimate criterion was a substantial factor" in an employment decision. *Id.* 109 S.Ct. at 1804. O'Connor went on to say that:

> Where a disparate treatment plaintiff has made such a showing, the burden then rests with the employer to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor. *Id.* at 1804.

O'Connor's argument, therefore, both supports and undermines Plaintiff's position. While O'Connor agrees that a Title VII defendant's burden should exceed that of the mere production of a legitimate business reason for the contested employment decision, she contends that there should be no shift of burden to the defendant until the plaintiff has established through the use of direct as opposed to inferential evidence that a Title VII violative factor was a substantial element in the contested employment decision.

 Even if this Court were to reject the clear mandate of the United States Supreme Court for Title VII analysis, as artic-

ulated in *McDonnell Douglas* and its progeny, as well as clear Ninth Circuit precedent as stated in *Gay v. Waiters'*, 694 F.2d at 538, and adopt either the *Wilson* modification or Justice O'Connor's model, plaintiff would still have failed to establish Title VII liability for either Hilton or McDonough. This is so because Plaintiff has not presented this Court with any direct evidence of racial discrimination. However, even if some of the evidence heard by this Court were construed to constitute direct evidence of discrimination, Plaintiff's case must nevertheless fail because it is the holding of this Court that Defendants have successfully rebutted any possible presumption of racial discrimination, whether established by direct or indirect evidence, by proving by a preponderance of the evidence that they would have taken any employment-related action that they implemented even absent the alleged impermissive motive. This Court reaches the same conclusion as found in *Fragante*, *i.e.*, "we have not been able to find even a hint of a mixed motive such as existed in *Price Waterhouse*. Instead, it appears that defendants were motivated exclusively by reasonable business necessity." *Fragante*, 888 F.2d at 598.

In order to prevail in a Title VII action, Plaintiff must establish (i) that there existed at the place of employment a "pattern or practice" of disparate treatment and, (ii) that such disparate treatment was "racially premised." *Teamsters*, 431 U.S. at 335, 97 S.Ct. at 1854. It follows from the discussion above, that Plaintiff has met neither of these requirements.

### Hostile Environment

 Even if Plaintiff herself was never the object of racial harassment, she might nevertheless have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive. *See, e.g., Vinson v. Taylor*, 753 F.2d 141, 146 (D.C.Cir.1985), *aff'd*, 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2404–405, 91 L.Ed.2d 49 (1986) (holding that harassment of women working alongside plaintiff was relevant to question of creation of environment viola-

tive of Title VII—although *Vinson* was a sexual harassment case, the principles underlying a hostile environment theory are equally applicable in sexual harassment and racial harassment cases). The phrase "terms, conditions or privileges of employment" in Title VII has been recognized as "an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination." *Vinson*, 477 U.S. at 66, 106 S.Ct. at 2405, *quoting with approval, Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). Title VII, therefore, provides employees with the "right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Vinson*, 477 U.S. at 66, 106 S.Ct. at 2405.

Plaintiff has cited *Equal Employment, etc. v. Murphy Motor Freight*, 488 F.Supp. 381 (D.Minn.1980), in support of her claim that a racially hostile environment existed in the executive offices in which she worked at the Hilton Hawaiian Village. *Murphy* articulated a two-pronged requirement for Title VII liability under a hostile environment theory. First,

> [M]ore than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions. *Murphy*, 488 F.Supp. at 384 (cites omitted) (found Title VII violation where plaintiff subjected to "vicious, frequent, and reprehensible instances of racial harassment.")

Second, a Title VII claimant is required to demonstrate that the employer " 'failed to take reasonable steps to prevent racial harassment....' " *Id.* at 385, *citing, Croker v. Boeing Co.*, 437 F.Supp. 1138, 1191 (E.D.Pa.1977).

The Supreme Court, however, has stated that there must exist some nexus between alleged improper conduct and a term, condition, or privilege of employment.

> Of course, ... not all workplace conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment within the meaning of Title VII. *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405.

Moreover, the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not sufficiently affect the conditions of employment to violate Title VII. *Rogers v. EEOC*, 454 F.2d at 238, *quoted with approval in, Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405, *see also, Cariddi v. Kansas City Chiefs Football Club*, 568 F.2d 87 (8th Cir.1977) (holding that employer's occasional reference to plaintiff as "dago" and to other Italian-American employees as the "Mafia," constituted isolated or sporadic derogatory ethnic comments as part of casual conversation that did not rise to level necessary for violation of Title VII). The Supreme Court has decided that for racial harassment to be actionable under Title VII, "it must be sufficiently severe or pervasive 'to alter the conditions of [the claimant's] employment and create an abusive working environment.' " *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405, *quoting, Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir.1982).

While Plaintiff in the instant case has not proved the occurrence of a single incident that would rise to the level of the "vicious, frequent, and reprehensible instances of racial harassment" that were found in *Murphy*, more important, she has failed to establish the existence of any objective racially offensive statement or conduct either directed at herself or that occurred in her presence. Nor has Plaintiff established, as required by *Vinson*, some nexus between alleged improper conduct and a term, condition, or privilege of employment. Accordingly, this Court holds that Plaintiff has not demonstrated the existence of a racially hostile environment invoking Title VII liability.

## CONSTRUCTIVE DISCHARGE

It is now well established in the Ninth Circuit that an employee who prevails in a Title VII action who resigned his employment may not receive backpay unless he was constructively discharged by his employer. *Satterwhite v. Smith*, 744

F.2d 1380, 1381 n. 1 (9th Cir.1984), *citing, Muller v. United States Steel Corp.,* 509 F.2d 923, 930 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975).

According to the Ninth Circuit in *Watson v. Nationwide Ins. Co.,* 823 F.2d 360, 361 (9th Cir.1987) (Title VII action alleging constructive discharge):

A constructive discharge occurs when, looking at the totality of circumstances, "a reasonable person in [the employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working conditions." *Watson,* 823 F.2d at 361, *quoting, Satterwhite v. Smith,* 744 F.2d 1380, 1381, (9th Cir.1984), *and citing, Nolan v. Cleland,* 686 F.2d 806, 812 (9th Cir.1982), *quoting with approval, Bourque v. Powell Electrical Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980) ("a constructive discharge exists when 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' ").

The "reasonable person in the employee's position" test is an objective standard. *Watson,* 823 F.2d at 361, *citing, Satterwhite,* 744 F.2d at 1383 and *Nolan,* 686 F.2d at 814 n. 17. The *Satterwhite* decision explicitly rejected the Tenth Circuit's reliance upon the employer's "intent" as being out of step with the weight of authority and the law of the Ninth Circuit regarding constructive discharge. *Satterwhite,* 744 F.2d at 1383, *citing, Muller v. United States Steel Corp.,* 509 F.2d 923, 929 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975).

The outcome of this objective test, therefore, must turn on the facts of each case. *Watson,* 823 F.2d at 361, *quoting, Satterwhite,* 744 F.2d at 1382. Moreover, in a bench trial, it is the district court judge who determines whether the facts of the case meet this objective standard:

The determination whether conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question left to the trier of fact. *Watson,*

823 F.2d at 361, *citing, Lojek v. Thomas,* 716 F.2d 675, 677, 689 (9th Cir.1983).

The Ninth Circuit, however, has not left the trial judge without guidance in determining whether a plaintiff has met the "reasonable person" test. The *Watson* panel stated the generally accepted proposition that "a 'single isolated instance' of employment discrimination is insufficient as a matter of law to support a finding of constructive discharge." *Watson,* 823 F.2d at 361, *citing, Nolan,* 686 F.2d at 813–14 (held that evidence of four incidents of differential treatment over two years was sufficient to create a genuine issue of fact for trial); *Satterwhite,* 744 at 1381–82 ("courts which have considered the question [of constructive discharge] are reluctant to predicate a finding of constructive discharge solely on the fact of employment discrimination."); *see also, Clark v. Marsh,* 665 F.2d 1168 (D.C.Cir.1981) (holding that the mere fact of discrimination sans aggravating factors would not sustain a constructive discharge action).

In order to prevail in a Title VII constructive discharge action, therefore:

[A] plaintiff alleging a constructive discharge must show some " 'aggravating factors,' *such as* a 'continuous pattern of discriminatory treatment.' " *Watson,* 823 F.2d at 361 (emphasis in original), *quoting, Satterwhite,* 744 F.2d at 1382.

Accordingly, the Ninth Circuit has upheld findings of constructive discharge in circumstances wherein plaintiffs have established the existence of incidents of differential treatment that spanned a period of months or years. *See, e.g., Wakefield v. NLRB,* 779 F.2d 1437, 1439 (9th Cir.1986) (a variety of discriminatory incidents occurred over two year period of time culminating in a physical assault upon plaintiff by agents of the employer); *Satterwhite,* 744 F.2d at 1383 (employer refused to promote black "casual employee" to permanent position thereby preventing him from gaining access to training and any hope of advancement; employer regularly promoted white men above plaintiff whom plaintiff was forced to train; plaintiff relegated to spending disproportionate amount of time

performing dull and demeaning tasks); *Nolan*, 686 F.2d at 813 (reversing district court's grant of employer's motion for summary judgment because: plaintiff deprived of participation in employer's education program; senior agent of employer discriminatorily refused to provide plaintiff with required evaluations; inaccurate personal evaluation from another agent of employer that was discriminatorily motivated; discriminatory-retaliatory assignment to position not requested by employee); *Watson*, 823 F.2d at 361–62 (discriminatory notice to plaintiff of potential relative rule violation; employer conspired to create trumped up charges of inadequate job performance where plaintiff had history of excellent employment ratings; discriminatory subjection to abusive treatment and harassment; employer told plaintiff she was a poor and incompetent supervisor; supervisory duties transferred away from plaintiff; plaintiff told she was considered a "bitch" and that she could either resign or be demoted below her subordinate trainees); *Ford v. Alfaro*, 785 F.2d 835, 841–42 (9th Cir.1986) (a Fair Labor Standards Act case finding constructive discharge where employee was physically threatened, harassed for two weeks, and not given sufficient work assignments).

■ In the instant case, Plaintiff has not even met her initial burden of demonstrating any level of employment discrimination on the part of Defendants. On the contrary, corroborated evidence has been heard by this Court in support of finding that McDonough actually discriminated *in favor* of Plaintiff rather than to her detriment. Moreover, there have been presented to this Court no "aggravating factors" of any kind and certainly none that would rise to the level of the factors that existed in *Wakefield, Satterwhite, Nolan, Watson,* and *Ford.* Accordingly, this Court holds

that Plaintiff was not constructively discharged from her employment.

### *Attorney's Fees*

■ Defendant has requested an award of attorney's fees. Section 706(k), 42 U.S.C. § 2000e–5(k) provides that a court may allow payment of attorney's fees to the prevailing party in a Title VII action. Payment of attorney's fees, however, lies within the sound discretion of the district court and should be awarded only where the plaintiff's case was so meritless and vexatious as to warrant such payment.

> [A] district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith. * * * Hence, a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so. And, needless to say, if a plaintiff is found to have brought or continued such a claim in *bad faith*, there will be an even stronger basis for charging him with the attorney's fees incurred by the defense. *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 421–22, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978).

Although it is held herein that Plaintiff has failed to establish Title VII liability on the part of either Hilton or McDonough, this Court does not conclude that Plaintiff's action was frivolous, unreasonable, without foundation, or that it was brought in bad faith. Accordingly, Defendant's request for an award of attorney's fees is hereby denied.

This decision is further based upon the Findings of Fact and Conclusions of Law to be entered herein.

## TABLE OF CONTENTS

| | | Page No. |
|---|---|---|
| TABLE OF AUTHORITIES | ............................................. | 558 |
| I. | INTRODUCTION ...................................................... | 559 |
| II. | FINDINGS OF FACT ................................................. | 559 |
| III. | CONCLUSIONS OF LAW ............................................. | 574 |
| IV. | ORDER ............................................................... | 582 |

## TABLE OF AUTHORITIES

CASES PAGE NOS.

Bodnar v. Synpol,
843 F.2d 190 (5th Cir.1988)...........................................575, 579
Bristow v. Daily Press, Inc.,
770 F.2d 1251 (4th Cir.1985)....................................576, 579, 580
Cariddi v. Kansas City Chiefs Football Club, Inc.,
568 F.2d 87 (8th Cir.1977).........................................576, 581
Christianburg Garment Co. v. EEOC,
431 U.S. 412 (1978) ......................................................582
Croker v. Boeing Co. (Vertol Div.),
437 F.Supp. 1138 (E.D.Pa.1977)........................................580
EEOC v. Hacienda Hotel,
881 F.2d 1504 (9th Cir.1989).............................................574
EEOC v. Murphy Motor Freight,
488 F.Supp. 381 (D.Minn.1980).........................................580
Ford v. Alfaro,
785 F.2d 835 (9th Cir.1986)........................................577, 582
Fragante v. City and County of Honolulu,
888 F.2d 591 (9th Cir.1989).............................................577
Gay v. Waiters and Dairy Lunchmen's Union,
694 F.2d 531 (9th Cir.1982).............................................577
Grant v. Morgan Guaranty Trust Co. of New York,
638 F.Supp. 1528 (S.D.N.Y.1986).......................................574
Henson v. Dundee,
682 F.2d 897 (11th Cir.1982)............................................581
Hollcroft v. Dept. of Treasury, I.R.S.,
687 F.Supp. 510 (E.D.Cal.1988).........................................576
International Broth. of Teamsters v. United States,
431 U.S. 324 (1977) .....................................................582
Irving v. Dubuque Packing Co.,
689 F.2d 170 (10th Cir.1982)........................................576, 579
Johnson v. Bunny Bread Co.,
646 F.2d 1250 (8th Cir.1981).......................................576, 579
Jordan v. Clark,
847 F.2d 1368 (9th Cir.1988), cert. denied, 109 S.Ct. 768 (1989)........576
McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973) ....................................................577
Meritor Sav. Bank, FSB v. Vinson,
477 U.S. 57 (1986) ...............................................574, 575, 577,
 578, 580, 581
Miles v. M.N.C. Corp.
750 F.2d (11th Cir.1985)...............................................575
Nolan v. Cleland,
686 F.2d 806 (9th Cir.1982)........................................577, 582
Pejic v. Hughes Helicopter, Inc.,
840 F.2d 667 (9th Cir.1988).............................................575
Price Waterhouse v. Hopkins,
—— U.S. ——, 109 S.Ct. 1775 (1989) .................................577
Rogers v. EEOC,
454 F.2d 234 (5th Cir.1971).........................................578, 581
Satterwhite v. Smith,
744 F.2d 1380 (9th Cir.1984).......................................574, 577, 578,
 579, 582

CASES PAGE NOS.
Schuler v. Chronicle Broadcasting Co.,
793 F.2d 1010 (9th Cir.1986)........................................575
Staton v. Maries County,
868 F.2d 996 (8th Cir.1989).........................................574
Steele v. Offshore Shipbuilding, Inc.,
867 F.2d 1311 (11th Cir.1989), reh'g denied, 874 F.2d 821 (11th Cir.
1989).........................................................................574
Texas Dept. of Community Affairs v. Burdine,
450 U.S. 248 (1981)........................................................575, 577
United States Postal Services v. Aikens,
460 U.S. 711 (1983)........................................................575
Wakefield v. NLRB,
779 F.2d 1437 (9th Cir.1986)........................................577, 582
Watson v. Nationwide Insurance Co.,
823 F.2d 360 (9th Cir.1987).........................................574, 575, 577,
 578, 579, 582
Wilson v. City of Aliceville,
779 F.2d (11th Cir.1986).............................................575
Young v. General Foods Corp.,
840 F.2d 825 (11th Cir.1988), cert. denied, 488 U.S. ——, 109 S.Ct. 782
(1989) ..........................................................................575

STATUTES
28 U.S.C. § 1331.................................................................574
28 U.S.C. § 1391.................................................................574
Title VII, Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.
 42 U.S.C. § 2000e-2(a) ...............................................574
 42 U.S.C. § 2000e-5(f) ...............................................574
 42 U.S.C. § 2000e-5(k) ...............................................582

OTHER AUTHORITIES
Black's Law Dictionary (5th ed., 1979)...............................575

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

### I. INTRODUCTION

Based upon the Court's review of the record, pleadings, evidence, memoranda, argument, and having had an opportunity to observe the demeanor and manner of the witnesses, the Court finds and concludes, as stated below, that Plaintiff, Bunny Kishaba has not met her burden of proving the merits of her Title VII action or that she was constructively discharged.

### II. FINDINGS OF FACT

The Court makes the following findings of fact:

1. If any of the findings of fact are determined to be conclusions of law, they shall be so treated, notwithstanding their inclusion here as a finding of fact.

2. Plaintiff Bunny Kishaba ("Kishaba") is a resident of Honolulu, Hawaii.

3. Defendant Earl McDonough ("McDonough") is a resident of Tarrytown, New York. Defendant Hilton Hotels Corporation ("Hilton") is a California corporation. Hilton is engaged in the ownership and operation of hotels including, *inter alia*, the Hilton Hawaiian Village Hotel ("Village") located in Honolulu, Hawaii.

4. Kishaba was employed at the Village from November 1968 to March 3, 1987. Kishaba resigned her employment on February 17, 1987, effective March 3, 1987. At the time she resigned, Kishaba was employed as the senior Executive Secretary to McDonough. In her letter of resignation, Kishaba did not state any reason for her

resignation (Plaintiff's Exhibit, hereafter "PX," 34). At no time prior to her resignation, did Kishaba complain to McDonough that his conduct toward her was racially discriminatory or unwelcome. Nor did Kishaba complain to McDonough's superiors at Hilton with whom she had a personal acquaintance and frequent contact.

5. McDonough was employed by Hilton as its Senior Vice President for the Hawaii Region and Managing Director of the Village from April 1, 1984 until his retirement on November 1, 1988 due to ill health.

6. During 1982, Kishaba suffered a nervous breakdown requiring hospitalization which resulted in a loss of her short term memory. After a two week absence, Kishaba resumed her duties as Executive Secretary to then Senior Vice President for the Hawaii Region, Don Madsen ("Madsen"). Kishaba continued working for Madsen until his retirement on March 31, 1984. Madsen was very solicitous of Kishaba after her nervous breakdown and made concessions regarding her work load and work pace to accommodate Kishaba (Madsen Depo. at 72–74).

7. In her sworn statement to the Equal Employment Opportunity Commission ("EEOC") and in her subsequent February 24, 1989 sworn affidavit submitted in this action by her legal counsel ("affidavit"), Kishaba stated that she resigned because she thought she was going to be fired or transferred to another job, and not because of McDonough's alleged race discrimination (PX 37 at ¶ 2; PX 39A at ¶ 10; Defendants' Exhibit, hereafter "DX," 29 at ¶ 19). As Kishaba noted in her March 10, 1987 letter to Barron Hilton, she resigned to avoid having her reputation discredited by the termination which she believed was forthcoming. (PX 38, p. 2)

8. Prior to arriving in Hawaii, McDonough was the Senior Vice President for Hilton's Western Region where he supervised an expansion from 8 to 15 hotels and a renovation of several of the original hotels. While in charge of the Western Region, McDonough often visited Hawaii and developed a fondness for Hawaii. Accordingly, when the Hawaii Region became available in 1984, he applied for the position. Hilton selected McDonough to replace Madsen and oversee a substantial expansion of Hilton's business activities in Hawaii, including the creation of two new hotels (the Turtle Bay Hilton and Country Club and the Kauai Resort and Beach Villas) and a $100 million dollar reconstruction of the Village (the "Master Plan"). The Master Plan was a major undertaking by Hilton to upgrade the Village from the class "B" hotel McDonough believed it had become over the years, to a class "A" resort. The Master Plan included a complete reconstruction of the Village, as well as the hiring and training of several hundred additional employees.

9. McDonough met with Kishaba, shortly after arriving in Hawaii. During their meeting, McDonough told Kishaba he was happy to be in Hawaii and informed her that Hilton's substantial expansion of activities in Hawaii, including the Master Plan, would significantly add to their duties. McDonough also explained he was a hands-on manager whose style of work involved extensive dictation requiring a secretary with strong grammar and composition skills. McDonough told Kishaba that Madsen informed him of her previous nervous breakdown and loss of memory, but McDonough believed having her as his secretary would be an asset because of her years of service and familiarity with the local community and customs.

10. Kishaba shared with McDonough her concerns as to whether she could both cope with the increased work load in view of her previous nervous breakdown and short term memory loss and also adjust to McDonough's different work style. McDonough encouraged Kishaba to stay on as his Executive Secretary and see if she could do the job. He stated that he would give her assistance and she should set up procedures to cope with the work load. Kishaba agreed to stay on as his Executive Secretary.

11. During McDonough's entire tenure in Hawaii, the Executive Office staff was a multi-racial group of Caucasians, Asians, and Pacific Islanders. When McDonough

assumed his position on April 1, 1984, the Executive Office was located in the Ocean Tower and included the Senior Vice President (McDonough) and the Regional Director of Sales (Fred Sarno). The clerical staff included Kishaba (Asian); Tina Cain, Sarno's secretary; and Joyce Hurst (Caucasian), the receptionist and part-time secretary to the Regional Director of Leasing who was located in another office, Pat Stone. By the time McDonough retired in 1988, the Executive Office had grown to include three managers and five secretaries: the Senior Vice President, the General Manager, the Resident Manager, and their respective secretaries, Sheila Stimmel (Caucasian), Eleanor Jackson (Asian/Pacific Islander), Gladys Inamine (Asian), Charlene Lee (Asian), and the Resident Manager's secretary. After Kishaba resigned, McDonough replaced her with Janet Matsuko (Asian). When Matsuko resigned to accept a better paying position, McDonough hired Eleanor Jackson (Asian/Pacific Islander).

12. During McDonough's tenure, the work load in the Executive Office was constantly increasing as the new hotels became fully operational and the Master Plan moved into high gear. McDonough's hands-on management style necessitated more meetings (e.g., monthly Department Head meetings became weekly meetings) and correspondence (e.g., copying McDonough on all department head correspondence), which in turn resulted in more dictation, typing, filing, and scheduling for Kishaba. Kishaba was not able to cope with the increased work load. The office was in disarray. There were files stacked everywhere, documents waiting to be filed, and dictation to be transcribed. As a result, McDonough was often sent to "wing it" at meetings with incomplete files. He was forced to either borrow files from other managers or in some instances, cancel the meeting. He was also confronted by visitors with appointments that had never been noted on his calendar.

13. McDonough tried to help Kishaba cope with the increasing work load. Initially, he moved the General Manager and his secretary into the Executive Office and reassigned Hurst to Kishaba full time to provide more secretarial help. When the backlog persisted, McDonough authorized the hire of a temporary secretary to work Saturdays to assist Kishaba with her work load. Yet, the backlog persisted so McDonough suggested that Kishaba adopt the Sales Office's filing system and told her to transfer the "Red Border" (V.I.P. reservations) procedures to the Front Office to lessen the work load. McDonough also tried using speed memos rather than dictating all correspondence. Despite these efforts, Kishaba still could not keep up with the increasing work load and fell further behind. The files continued to pile up around the office. McDonough continued to attend meetings and try to respond to inquiries from his superiors with incomplete files or without any files at all.

14. So again, to assist Kishaba, McDonough instructed her to hire a full-time assistant, but at the same time, refused to hire an assistant for the General Manager's Caucasian secretary, Beverly Stratton ("Stratton"). Kishaba hired Brenda Sur–Matsui ("Sur–Matsui") (Asian), as her assistant, with the job title of Correspondence Secretary. At the same time, Rhonda Hartney (Caucasian) was hired as a receptionist replacing Hurst. McDonough retained Sur–Matsui upon the completion of her probationary period, but terminated Hartney, whom he felt was not qualified. After a few months, Sur–Matsui transferred to another position outside the Executive Office and was replaced by Candis Chang ("Chang") (Asian). When Chang transferred to another position, she was replaced by Marty Anderson ("Anderson") (Caucasian).

15. Even with the help of a second full-time secretary (i.e., Sur–Matsui, Chang, and finally, Anderson), Kishaba still could not cope with the increasing Executive Office work load. Indeed, McDonough originally authorized the hire of Anderson in late August 1985 as a temporary secretary while Chang served as Kishaba's regular full-time assistant, in order to provide additional manpower to help Kishaba catch up. During Anderson's entire tenure, the files

were still stacked throughout the office and McDonough's dictation was still backlogged.

16. In November 1985, McDonough asked Ted Baird ("Baird"), the Director of Human Resources, to find a replacement for Chang, who was being transferred because her secretarial skills were inadequate (PX 18). When Baird screened applicants for the Executive Secretary position, he determined that Anderson was the best qualified. Anderson initially refused to take the job if she, like Chang, had to report to Kishaba. Anderson believed Kishaba deliberately harassed her and sought to undermine her work and therefore conditioned acceptance of the job upon only working directly for McDonough. McDonough initially agreed to Anderson's demand and Anderson was hired as General Executive Secretary. When Kishaba learned that Anderson would report directly to McDonough, she complained, and McDonough then instructed Anderson to report to Kishaba. Rather than resign, Anderson reluctantly agreed to work under Kishaba.

17. Despite Anderson's presence, however, Kishaba still could not keep up with the increasing work load. McDonough was frustrated at the continued inability of the Executive Staff to keep abreast of his work load, especially with filing and dictation. McDonough believed that the backlog was due in part to Kishaba's failure to delegate work to other Executive Office staff and Kishaba's insistence upon using her own coding system for filing documents. The other secretaries found the coding system unintelligible and unworkable and, therefore, had to wait for Kishaba to code the documents before they could help her file. Kishaba was also backlogged because she first typed McDonough's dictations in draft, rather than typing a final directly from the dictation.

18. In order to break the filing logjam caused by Kishaba's coding system, McDonough assigned Robert Strom ("Strom"), a hotel operations analyst, to design a workable master filing system for the office. McDonough originally assigned Strom to the task in March 1986, but then told him to hold off after Kishaba made an emotional appeal for another chance to develop a workable system. McDonough's agreement to afford Kishaba an opportunity to establish a "workable" central filing system was reflected in her April 1986 Performance Review (PX 28).

19. The Performance Review contains McDonough's overall rating of Kishaba's performance as Exceeds Requirements, a "B" rating, while also noting that Kishaba had problems in managing the Executive Office's heavy work load. McDonough believed that the overall rating was warranted because Kishaba was extremely effective in handling confidential information, as well as dealing with guest complaints, department heads, and corporate executives. At the same time, McDonough also reiterated his prior oral advice to Kishaba that she needed to delegate more of her clerical duties because of the increasing work load. Kishaba also acknowledged in the Performance Review the need to improve Executive Office efficiency and productivity, create a "workable" master filing system, and organize McDonough's daily operations.

20. Kishaba's difficulty in coping with the work load was exacerbated by her conflicts with Anderson and Stratton. Anderson and Stratton described Kishaba as emotionally unstable, disorganized, petty, and "out of her depth." Gladys Inamine ("Inamine") (Asian) also described Kishaba as overly sensitive and unstable. Stratton and Anderson described several incidents in which they believed that Kishaba harassed them or tried to undermine their work. These included, *inter alia*, highlighting their mistakes on documents which would be seen by McDonough and placed in office files; persuading McDonough to deny Anderson compensatory time off to visit her sick mother; refusing to help Stratton or to permit any of her assistants to do the same; assigning Stratton to answer Strom's telephone calls; and writing demeaning statements on Anderson's mail (DX 18, 20, 21). Kishaba denied harassing Stratton and Anderson and insisted instead that Stratton and Anderson were overly sensitive and misunderstood her motives.

21. The conflict and rivalry between Kishaba and Anderson/Stratton, combined with the continued office backlog and disarray, came to a head in early February, 1986. McDonough had again been sent to a department meeting (i.e., the Laundry Department) only to find that his file was missing critical documents. He cancelled the Laundry Department meeting in great embarrassment. Upon returning to the Executive Office, he convened a meeting with the entire staff and once again implored in frustration, "Why can't you people organize my files?" and instructed them to establish a workable system. The next day, Stratton and Anderson approached Kishaba and told her they were ready to work with her on a filing system. Kishaba replied that she was too busy and "when Mr. McDonough tells her these things, she just nods and then comes out of the office and does it her own way." Kishaba then told them to return to their desks and leave things the way they were. Kishaba's recollection was only slightly different. Kishaba claims she told Stratton and Anderson that she would do coding and if they caught up with the filing, McDonough would forget his directive to devise a new filing system. Stratton and Anderson prepared a memorandum reflecting this incident for Baird, whom they hoped would help resolve their conflict without involving McDonough (DX 19).

22. Instead of handling the matter himself, however, Baird took the memorandum to McDonough. McDonough called Kishaba into his office and showed her the memorandum. He was critical of Kishaba for the continued dysfunctioning of the office and stated that he was going to hold a meeting with the three secretaries to resolve their discord. Kishaba asked McDonough not to hold the meeting, but instead, let her resolve the problem with Stratton and Anderson. When McDonough refused, Kishaba grew distraught and left his office to regain her composure. She then decided to go home and skip the meeting because she believed McDonough would side with Stratton and Anderson.

23. When McDonough and Baird met with Stratton and Anderson, however, instead of siding with Stratton and Anderson, McDonough supported Kishaba to the "nth" degree. McDonough responded to Stratton and Anderson's criticism by stating that he had to support Kishaba, who "has been here for 18 years," and that Stratton and Anderson had to learn to work with Kishaba or leave. At one point, McDonough sharply admonished Stratton for criticizing Kishaba because "Bunny is not here to defend herself."

24. McDonough's support of Kishaba contributed to Stratton's resignation on June 13, 1986, when McDonough refused to give her a raise in excess of the corporate policy ceiling after approving such a higher raise for Kishaba. Similarly, Anderson resigned in August 1986, when a secretarial job became available at Aloha Airlines. Because Kishaba was still behind in her filing and McDonough's dictation, McDonough knew he had to hire another secretary after Anderson left. Yet, fearing a repeat of the Anderson experience if he hired another person who reported to Kishaba, he decided to create a second secretarial position equal to Kishaba, which reported directly to him. McDonough asked the Human Resources Department to find a qualified Executive Secretary.

25. During October 1986, McDonough hired Sheila Stimmel ("Stimmel") (Caucasian), as his second Executive Secretary. Stimmel was recommended to McDonough by the Human Resources Department, which had screened the various applicants and selected Stimmel as among the most qualified. Stimmel was interviewed by Nancy Isenberg ("Isenberg"), the Director of Human Resources, and McDonough, both of whom told Stimmel she was hired to work alongside Kishaba as an equal. Stimmel was never told by Isenberg, McDonough, or anyone else that she was hired to replace Kishaba, that McDonough planned to fire Kishaba, or that she would be senior to Kishaba in any respect. McDonough told Stimmel he was hiring another secretary because the workload was too great for Kishaba alone and the job required someone with good communication and writing skills. McDonough was im-

pressed with Stimmel's success as Director of Communications for Liberty House, as well as her many years of residency in Hawaii. Prior hotel experience was unnecessary. McDonough offered the job to Stimmel and stated that he would assign work to her and Kishaba on an ad hoc basis initially, and then later evaluate the effectiveness and fairness of the allocation. McDonough offered Stimmel an annual salary of $25,000 which was $1,250 less than Kishaba's salary. After considering the offer for a day, Stimmel accepted.

26. Stimmel started work at the Village on October 6, 1986 and continues there to the present date. Stimmel observed Kishaba at work until mid-January 1987, when Kishaba left on sick leave and subsequently resigned. Stimmel and Kishaba performed the same basic secretarial duties (i.e., dictation, typing, filing, answering telephones). In addition, McDonough assigned Kishaba the opening of his mail and the marrying of correspondence with proper files, while Stimmel was charged with maintaining his calendar and expense accounts. Stimmel neither requested, nor was she assigned, less onerous tasks than Kishaba. Nor was Stimmel assigned more important or desirable tasks than Kishaba. Moreover, except for certain familiarization instructions (e.g., storage of certain files or materials, procedures for V.I.P. reservations), Kishaba neither provided training to Stimmel, nor offered Stimmel Kishaba's alleged office procedures manual. The manual itself states on its first page that it belongs to Kishaba personally and that she authorized copies only for Lee and Sur-Matsui (PX 58).

27. Even after Stimmel's arrival, Kishaba continued to insist on coding her own documents and resisted McDonough's efforts to create a single centralized filing system. Kishaba's insistence on maintaining a separate filing system for McDonough's files, rather than integrating the files of all the Executive Office managers, prevented Stimmel and the other secretaries from helping Kishaba catch up on the filing of McDonough's work. Stimmel described the Executive Office when she started working as "disorganized and lit-

tered with paperwork waiting to be filed". Inamine, who ultimately replaced Stratton as the General Manager's secretary, also described the Executive Office as "chaotic" and littered with files stacked everywhere on the floor, desks, and filing cabinets when she arrived in October 1986. Again, to help Kishaba cope with the filing backlog, McDonough held two staff meetings in November 1986 with Strom to organize the office and design an efficient centralized filing system (PX 23, 24). Despite Strom's efforts and the November 1986 staff meetings, it was not until after Kishaba resigned that the Executive Office staff was able to centralize the files and create a workable master filing system.

28. During the three months they worked with Kishaba and McDonough, neither Inamine, nor Stimmel, ever observed or heard McDonough express a racial slur or other racially derogatory statement to or about Kishaba. Nor did Stimmel or Inamine ever see McDonough throw papers or any other objects at Kishaba. Stimmel did observe McDonough express anger and frustration with Kishaba on several occasions and speak to her in a frustrated or firm tone of voice which Stimmel believed was rude. Stimmel acknowledged, however, that McDonough used the rude tone of voice only when he became frustrated because Kishaba had failed to perform her work satisfactorily and never because of her Asian race. Stimmel and Inamine stated that McDonough used the same frustrated or angry tone of voice with them when they did not perform to his satisfaction. Stimmel and Inamine also testified that they heard McDonough use the phrase "you people" when expressing his frustration over the failure of the Executive Staff to resolve the problems with filing and his dictation. Stimmel and Inamine always understood that the phrase "you people" referred to the entire Executive Office staff, and not just Kishaba or persons of any one race.

29. Kishaba decided to resign in late January 1987, because of her excessive sensitivity to the hiring of Stimmel and triggered by her erroneous conclusion that

McDonough had decided to fire her or transfer her to Assistant Manager which Kishaba believed would discredit her professional reputation and cause her humiliation (DX 29, ¶ 19). Kishaba's belief that McDonough was planning to fire her is not based upon any probative evidence, but instead upon Kishaba's speculation surrounding the following two events in mid-January 1987.

On Friday, January 9, 1987, Kishaba was in McDonough's office and saw her personnel file on his desk along with the files of several other employees. Kishaba immediately concluded that McDonough planned to take her file to a corporate meeting in order to discredit her as a prelude to discharge or transfer (PX 39A at ¶ 10). In fact, McDonough was not taking her file to corporate headquarters to discredit her, but rather, to obtain suggestions from William McDonald, Hilton's Senior Vice President for Human Resources, on how to help Kishaba cope with the office work load. McDonough left on Sunday, January 11, 1987 for the corporate meeting. As he was leaving, he told Peter Schall ("Schall"), Village General Manager, that he had decided to hire a full-time file clerk to help implement the new centralized filing system suggested by Strom at the November 1986 staff meeting. McDonough asked Schall to have the Human Resources Department screen applicants for the position. Because Kishaba was bogged down with filing, and perhaps not realizing Kishaba's sensitivity about the matter, McDonough also told Schall to have Stimmel and Inamine interview the candidates referred by the Human Resources Department. McDonough left for his trip that evening and was not able to discuss his file clerk decision with Kishaba and the other Executive Staff when they returned to work on Monday morning, January 12. Instead, when the secretaries reported to work on Monday, Schall asked Stimmel and Inamine to interview the candidates referred by the Human Resources Department. Kishaba insisted the meeting between Schall, Inamine and Stimmel lasted 45–60 minutes; Stimmel and Inamine testified the meeting lasted 5 minutes. In any event, Kishaba concluded that assign-ing the file clerk interviews to Stimmel and Inamine ominously confirmed her conclusion on January 10, 1987, that McDonough planned to fire her. Kishaba left on sick leave at the end of the week, January 16, 1987, and never returned. Instead, she resigned on February 17, 1987, effective March 3, 1987.

30. McDonough never disciplined Kishaba during her employment as his Executive Secretary. In fact, McDonough gave Kishaba a favorable job performance evaluation. He also approved a wage increase which was the largest among the Executive Staff and exceeded corporate ceilings for Kishaba, who was the highest paid secretary in the Hawaii Region. Even after Kishaba gave notice of her resignation, McDonough responded by letter dated February 27, 1987, offering Kishaba the opportunity to transfer to an Assistant Manager's job at no reduction in salary if Kishaba could not cope with the stress and workload of her Executive Secretary position (PX 35). McDonough also stated in his letter that he would continue her employment even if she refused the offer of an Assistant Manager's position (PX 35). Kishaba never replied to McDonough's February 27, 1987 letter, and instead, filed a race discrimination charge with the EEOC and sent a letter to Barron Hilton. In her detailed EEOC filing and letter to Barron Hilton, Kishaba attributed her resignation to her belief that McDonough planned to fire or transfer her to another position because of his preference for Stimmel (PX 37, 38, 39A). At the trial, Kishaba also alleged several examples of harassment, many for the first time, which she now claims evince discrimination against her because of her Asian ancestry. These examples include statements and conduct of which Kishaba had personal knowledge prior to her resignation, as well as statements and actions of which she had no personal knowledge until after this action was filed.

31. The alleged discriminatory statements of which Plaintiff claims personal knowledge include statements referring to Kishaba, as well as statements referring to other Asian and non-Asian employees. The

statements which Kishaba claims referred to her Asian ancestry include the following:

*The "You People" Statements.* Kishaba stated that the first instance of a discriminatory "you people" statement occurred when McDonough arrived in Hawaii in April 1984 and allegedly told Kishaba, "I don't know how you people run things down here, but I run a tight ship." Kishaba conceded during cross examination that the "you people" who were running things in Hawaii prior to McDonough's arrival were Madsen (Caucasian) and his management staff. Other "you people" statements included instances in which McDonough became angry or frustrated because of a mishap in the office and exclaimed "Why can't you people do my work?", or "I'll get Robert Strom in here to teach you people how to do things right", or "Why can't you people get things organized?"

The other secretaries (Stratton, Anderson, Stimmel, and Inamine) testified that McDonough frequently used the phrase "you people" in their presence as well. All understood the term to refer to the entire Executive Staff, which included both Asian and non-Asian employees. None of the secretaries believed the statement referred simply to Hawaii residents of Asian ancestry or even to just non-Caucasian residents of Hawaii. McDonough always used the statement in reference to an office mishap when a particular work or filing assignment was not completed to his satisfaction.

*The "Guy Buffet" Incident.* Kishaba testified that sometime during Fall 1986, McDonough asked her opinion about some art work by Guy Buffet. Kishaba testified that she was embarrassed when McDonough asked her and Stimmel to pronounce the artist's name and she pronounced it incorrectly. Both McDonough and Stimmel denied the occurrence of this name pronouncement contest. Further, the name contest was not described in any of Kishaba's pre-trial statements including her sworn EEOC statement, the February 24, 1989 affidavit, and her pre-trial deposition. (PX 37, 39A; DX 29). Nor did Kishaba

reference this alleged incident in her March 10, 1987 letter to Barron Hilton (PX 38).

*Kishaba's Accent and Hairdo.* Kishaba testified that on an undated occasion, McDonough asked about her accent. On another undated occasion, she arrived in the Executive Office with a new hairdo and McDonough allegedly greeted her with a joking comment, "What kind of hairdo is that? Are you our resident Samoan?" Kishaba testified that she jokingly replied, "No, I'm the resident Afro." Kishaba did not mention either incident in any of her sworn pre-trial statements including her EEOC statement, affidavit, and deposition. Nor did she refer to the incident in her letter to Barron Hilton (PX 37, 38, 39A; DX 29). McDonough denied making any references to her hairdo or accent.

*The Hula Reference.* Kishaba testified that on one unspecified date in Fall 1986, a hotel guest complimented McDonough on the hula show which Kishaba conducted each Saturday on the Village premises. Kishaba testified that McDonough responded to the guest's compliment by stating, "I have to be the only Senior Vice President who is stuck with a secretary who does the hula." In her sworn EEOC statement, Kishaba wrote that McDonough simply told the guest, "Yes, I have the only secretary who teaches hula" (PX 39A, ¶ 10). McDonough recalled the incident, but testified he merely responded to the guest stating with pride, "Yes, I am the only Senior Vice President who has a secretary who conducts a hula show." The undisputed evidence also shows that Kishaba conducted the hula show with McDonough's permission and, on at least one occasion, McDonough asked Kishaba to take her hula show to the airport to greet his brother-in-law. In addition, Telana Mezurashi, Director of Catering, testified that she frequently saw McDonough standing in the crowd at the hula show watching Kishaba's show with great pride. There was no evidence that McDonough tried to hide the fact that Kishaba danced in a hula show or that only Asians dance the hula in Hawaii.

32. The alleged discriminatory statements of which Plaintiff claims personal

knowledge that refer to other employees include the following:

*The "Token Hawaiian" Statement.* Kishaba testified that some time in 1985 when the Kauai Hilton Hotel was preparing to open, McDonough told her he was promoting Kanani Akeo to Executive Assistant Manager and she would be their "token Hawaiian" at the Kauai hotel. Kishaba did not note this alleged comment in any sworn pre-trial statement, including her EEOC statement, her affidavit, and pre-trial deposition. Nor is it contained in her letter to Barron Hilton. (PX 37, 38, 39A; DX 29.) McDonough denied making this statement. In fact, McDonough made a commitment to the owners of the Kauai Hilton Hotel and Mayor Tony Kunimura to give a preference in hiring to people living on Kauai. The record also shows that a large number of the department heads hired at the Kauai hotel were of Asian and Pacific Islander ancestry. Accordingly, Akeo could not have been the only, or token Hawaiian, hired in a management position at the Kauai hotel.

*The Japanese Surrender Photo.* Kishaba testified that at some unspecified date while the Executive Office was still located at its original Ocean Tower location, McDonough showed her a photograph of the Japanese surrender agreement. Kishaba suggested that McDonough not display the photograph in the office because it might offend the hotel's Japanese guests. According to Kishaba, McDonough allegedly replied "they should know that we won the war." McDonough denied Kishaba's version, testifying that the photo was never displayed and, instead, stored in his office closet from where it was ultimately stolen. Kishaba did not note this incident in any of her sworn pre-trial statements, including her EEOC statement, affidavit, and deposition. Nor is it referred to in Kishaba's letter to Barron Hilton. (PX 37, 38, 39A; DX 29.)

*The Serge D'Rovencourt Incident.* At some unspecified date in late 1985 or early 1986, Kishaba claims that a representative of a Jewish organization planning a banquet at the Village called to speak with someone in the Executive Office for confirmation that food served at the banquet would conform with Jewish Kosher laws. When Kishaba informed McDonough of the call, McDonough allegedly responded, "give the call to Serge, he's our resident." Kishaba believed McDonough meant, but did not say, that D'Rovencourt was the "resident Jew", although she admitted never hearing McDonough use the term "Jew." McDonough denied ever referring or intending to refer to D'Rovencourt as the "resident Jew"; however, he admitted knowing that D'Rovencourt was a member of the Jewish faith and believed D'Rovencourt's expertise in food and beverage matters made him a better source for responding to the call. Kishaba also conceded that the statement referred to D'Rovencourt (Caucasian), and not Kishaba.

*The Robert Strom Bowing Incident.* Kishaba testified that at some unspecified date in Fall 1986, she was taking dictation in McDonough's office when Strom appeared for an appointment. McDonough allegedly told Strom he was busy and asked Strom to return later. According to Kishaba, as Strom backed out of McDonough's office, he began bowing to McDonough. McDonough apparently became angry or upset with Strom's display of obsequiousness and turned to Kishaba asking, "What is this bowing, some kind of Japanese?", while rapidly bowing himself. McDonough denied the incident. In fact, McDonough noted that he worked hard during his tenure to substantially increase the Hawaii Region's percentage of Japanese tourist business and added guest services specifically for Japanese guests. Strom also denied that the incident ever occurred. In any event, Kishaba acknowledges that McDonough's actions were directed at Strom (Caucasian), and not her.

*The Tony Miu Incident.* Kishaba testified about an incident involving Tony Miu in Fall 1986. Although Kishaba did not recall McDonough's alleged comment at her deposition or when she filed her EEOC statement and affidavit, or when she wrote to Barron Hilton (PX 37, 38, 39A; DX 29), she claims to have suddenly recalled several days before the trial what McDonough

allegedly told her. According to Kishaba, she and McDonough were alone in his office and she asked if McDonough wanted to sit in on a meeting between Miu and a group of Japanese travel agents. McDonough supposedly remarked casually, "We'll let the coolie handle it." McDonough then allegedly poked Kishaba in the ribs with his elbow and jokingly stated, "but we don't have to tell him that." McDonough denied making the statement or ever referring to Miu as a "coolie." The record evidence also shows that McDonough hired Miu to replace a Caucasian employee, Lee Umstad. There is no evidence of any adverse employment action by McDonough involving Miu.

*The D'Rovencourt And Stone Romances.* Kishaba testified that in late 1985 or early 1986, McDonough questioned her about separate incidents involving General Manager Serge D'Rovencourt and Director of Leasing Pat Stone. McDonough received a report from Baird that D'Rovencourt was carrying on an affair with an unnamed female Filipino employee of the Kona Hilton at the Village, where D'Rovencourt also lived with his wife and child. Kishaba testified that McDonough asked her if she knew the name of the Filipino lady involved in D'Rovencourt's affair. Kishaba claims that McDonough emphasized the woman's race when asking the question. McDonough testified that he asked Kishaba about the woman's identity, but denied emphasizing her race. McDonough simply tried to determine the woman's name so that he could check hotel records to confirm her presence at the Village. McDonough believed that the allegations about D'Rovencourt, if true, would constitute a serious infraction of Hilton's rules and possibly subject Hilton to a claim of sexual harassment. During cross-examination, Kishaba admitted that when McDonough questioned her, she understood he was trying to learn the name of the woman so he could corroborate the allegations regarding D'Rovencourt.

Turning to the Stone incident, Kishaba testified McDonough also received information on another occasion that Stone was living in a Village apartment unit provided by Hilton with a woman from Japan who had been involved with leasing retail space at the Village and then reselling the same space. According to Kishaba, McDonough asked her if she knew the Japanese woman's identity, emphasizing the word Japanese. McDonough testified that he did ask Kishaba about the identity of Stone's girlfriend, he denied emphasizing the word Japanese. McDonough testified that he received information which led him to believe that Stone and his unnamed girlfriend may have been engaged in an unlawful kickback scam involving the lease of hotel retail space and was simply trying to determine if the Japanese woman living with Stone was the same Japanese woman *whom* Stone was dealing with on the retail space leases. As a result of his investigation, McDonough subsequently terminated Stone.

Kishaba did not cite either of McDonough's inquiries regarding the identity of D'Rovencourt's girlfriend or Stone's accomplice in her EEOC statement, affidavit, pretrial deposition, or letter to Barron Hilton as examples of race discrimination by McDonough or reasons for her resignation (PX 37, 38, 39A; DX 29.)

*The "Eyes" Incidents.* Kishaba testified about two different incidents at unspecified times in late 1984 to early 1985, involving Sur–Matsui and Charlene Lee. According to Kishaba, McDonough's ear was bitten by his pet parrot, Skipper. Sur–Matsui, who observed the parrot's attack, thought the incident so humorous that she burst out laughing. When McDonough asked her if she had seen the parrot bite his ear, she said no, prompting McDonough to ask Kishaba, "What is the matter, can't she see out of those eyes?" Kishaba believed McDonough's comment about Sur–Matsui's inability to see was a derogatory reference to Sur–Matsui's Asian ancestry, rather than an expression of McDonough's frustration over Sur–Matsui's failure to corroborate the parrot's biting of his ear.

The Lee incident occurred when McDonough instructed Lee on making changes in a forecast report maintained by Lee which projected hotel occupancy rates for the Ha-

waii Region. According to Kishaba, when Lee did not immediately react to McDonough's instructions by making the changes, McDonough grew irritated with Lee and asked Kishaba, "What's the matter, can't she see out of those eyes?" Kishaba believes that the alleged statement by McDonough was a derogatory reference to Lee's Asian ancestry, rather than an expression of McDonough pique over Lee's failure to respond to his instructions.

McDonough denied making any references to Sur–Matsui's or Lee's eyes. In addition, Kishaba did not report either incident in her sworn pretrial EEOC statement, affidavit, and pretrial deposition. Nor did she refer to the incidents in her letter to Barron Hilton. (PX 37, 38, 39A; DX 29). Although Sur–Matsui, one of Kishaba's rebuttal witnesses, recalled the parrot incident, she did not corroborate Kishaba's testimony about McDonough's statement regarding her eyes. Kishaba did not call Lee to corroborate her statement regarding McDonough's reference to Lee's eyes. Significantly, however, Sur–Matsui did testify that although she and a Caucasian employee, Hartney, were hired with McDonough's approval at the same time, McDonough only approved Sur–Matsui's successful completion of her probationary period and did not retain Hartney.

*The Chang, Chang Incident.* Kishaba testified that at some unspecified time in early 1985, she recommended McDonough hire Candis Chang as the correspondence secretary to replace Sur–Matsui. According to Kishaba when she mentioned Chang's name to McDonough, he asked her, "Chang, Chang?" and reminded Kishaba that he wanted someone with good grammar and spelling skills. Kishaba allegedly replied that Chang might be a Caucasian lady with a Chinese name. Kishaba now claims McDonough's repetition of Chang's name and comment about good grammar and spelling evince racial bias against Asians. McDonough denied the incident. Further, the record shows that McDonough approved Chang's hire. In fact, Chang served as the correspondence secretary until November 1985, when she was transferred to another position because her grammar and spelling skills were simply inadequate for the position she held.

*The Desk Incident.* Kishaba originally testified that McDonough treated Stimmel more favorably by giving Stimmel her choice of desk when the Executive Office moved into new office space in November 1986. On cross-examination, however, Kishaba retracted her earlier testimony and stated that McDonough treated her and Stimmel the same by deciding for both which desks each would occupy. McDonough testified that he actually treated Kishaba more favorably by giving her the first opportunity to select the desk she would occupy. Stimmel testified that Kishaba's desk was so desirable she moved to it after Kishaba resigned.

*The Filipino Gardener Incident.* Kishaba also testified about an incident occurring at some unspecified date (probably in 1985 or early 1986, given that the incident occurred prior to Roy Sato's departure in August 1986). According to Kishaba, a Filipino gardener maintaining a ficus plant in McDonough's office made some comments to McDonough which McDonough could not understand because of the gardener's strong Filipino accent. McDonough allegedly turned to Kishaba with his mouth open. Kishaba interpreted McDonough's expression to mean that he could not understand the gardener's remarks because of his heavy accent and was asking Kishaba if she understood. Kishaba told McDonough what the gardener had said. Kishaba now claims the gardener was embarrassed by McDonough's inability to understand his comments and that this action somehow evinces race discrimination against Asians. Kishaba also testified, however, that on future occasions when McDonough's office plants needed grooming or maintenance, McDonough asked Kishaba to arrange for Fred Ing or Roy Sato to do the work. Both Ing and Sato are of Asian ancestry. McDonough testified that he may have had difficulty understanding some local accents, but that was one of the reasons he wanted Kishaba as his secretary—to help him understand some of the local accents and customs with which he

was not familiar. Kishaba did not note the incident with the Filipino gardener in any of her pretrial statements, or the letter to Barron Hilton, as having occurred or as being a reason for her decision to resign (PX 37, 38, 39A; DX 29).

33. Kishaba offered testimony from several witnesses regarding alleged statements by McDonough of which Kishaba herself had no personal knowledge prior to her resignation to support her claim that McDonough's allegedly discriminatory statements and actions toward her were motivated by her Asian race. Testimony of these alleged statements was presented by Ted Baird and James Munroe, and through the depositions of Sue Leong, Jamie Guerrero and Jay Mollicone.

*The Ted Baird Testimony.* Baird testified that on two or three occasions, McDonough expressed some concern to him about hiring women and local residents for management jobs by making stereotype remarks. Baird testified that McDonough told him he did not like to hire locals in supervisory positions because they tended to be "slow, lazy, and laid back." Baird also testified that in making the actual hiring decisions, however, McDonough did not apply any stereotype views or discriminate in any unlawful manner. Instead, McDonough invariably accepted Baird's advice that neither race nor gender could play a role in the hiring decision and selected the person Baird recommended as best qualified. Accordingly, in both the Catamaran and Dome hiring incidents, Baird testified that McDonough approved hiring the most qualified person. In the Catamaran incident, McDonough approved hiring Steve Martin, a local Caucasian who was recommended for the position by Sam Min (Asian), the Director of Sales for the Catamaran, and found by Baird to be the most qualified applicant. In the Dome incident, McDonough approved hiring a local resident of Asian and Pacific Islander ancestry whom Baird found to be the most qualified. Baird also testified that he was not aware of any instance in which McDonough made any derogatory comment about Kishaba's Asian ancestry or took any discriminatory action against Kishaba because of her Asian ancestry. To the contrary, Baird testified that McDonough supported Kishaba against the charges of harassment and incompetence made by Stratton and Anderson.

*The James Munroe Testimony.* Munroe, former Chief of Security for the Village, presented hearsay testimony about statements McDonough supposedly made to Baird and Baird later repeated to Munroe. Munroe also testified about McDonough's handling of department head meetings, in which McDonough supposedly belittled and demeaned department heads and other management officials. As for the department heads' meetings, Munroe's specific examples referred to comments by McDonough which Munroe believed were demeaning, but not racially motivated. In fact, of the three or four department heads specifically cited by Munroe as having been embarrassed by McDonough, all but one was Caucasian. The non-Caucasian was Segawa. According to Munroe, McDonough was addressing the department heads at a meeting when Howard Segawa suddenly broke out with a smile on his face. McDonough saw the smile, stopped his remarks, and turned to Segawa saying, "What is so funny, Howard? Wipe that silly grin off your face." Munroe testified that he felt embarrassed for Segawa. Munroe also testified he and the other managers learned to live with McDonough's demeaning style at department head meetings because he and the other managers realized that sooner or later it would happen to everybody.

McDonough did not recall the Segawa incident. Segawa, one of Kishaba's rebuttal witnesses, testified that he did recall a department heads' meeting at which he suddenly smiled in the middle of McDonough's remarks. Segawa stated his smile was prompted by loud growling noises from the stomach of a manager sitting next to him. Segawa testified that several days after the incident, he received a note from McDonough calling his attention to an attached handwritten note from the department head whose growling stomach had prompted his smile, explaining to McDon-

ough that Segawa's smile at the meeting occurred when her stomach growled and was not intentionally disrespectful of McDonough. McDonough's note stated that in light of the manager's statement, McDonough considered the matter closed (PX 100).

Finally, and more significantly, Munroe also testified that he never heard McDonough ever make any racially derogatory remark about Bunny Kishaba, nor did he have any personal knowledge of any racially discriminatory statements or actions by McDonough regarding Bunny Kishaba.

*The Susan Leong Testimony.* Kishaba offered Leong's deposition testimony that in 1984, McDonough and D'Rovencourt told Leong that they were hiring Baird as Director of Human Resources and reassigning Leong to Director of Personnel because she was not the right image and the department heads were not comfortable working with her. McDonough denied telling Leong that she was not the right image, however, McDonough agreed that Baird was brought in above Leong because of his superior qualifications and the need for someone whose judgment on hiring decisions would be respected by the department heads once the Master Plan construction was completed. Leong admitted that Baird was considerably more qualified than she for the position, and that hiring Baird was the best decision Hilton ever made. Baird also testified that when he resigned his position, he told Leong that he would not recommend her to replace him because he did not believe she was qualified.

*The Jay Mollicone Testimony.* Kishaba also offered deposition testimony from Mollicone, former General Manager of the Kauai Hilton Hotel. Mollicone had been a longstanding friend of McDonough's who served with McDonough at other Hilton properties, when McDonough brought Mollicone to Hawaii to serve as General Manager of the Kauai Hilton. Mollicone stated in his deposition that at several unspecified times in 1985 during their private meetings, McDonough told him ethnic jokes which contained racial slurs. These jokes involved both Caucasian and non-Caucasian

races and were received by Mollicone as private jokes without protest.

McDonough denied uttering slurs about any race to Mollicone. The record shows that Mollicone was extremely hostile to McDonough, having been terminated by McDonough for drug abuse. With regard to Kishaba, Mollicone testified that McDonough told him he had hired a second caucasian secretary because he needed someone that was not local but was on the same wave length with him. Mollicone further testified, however that Stimmel's hire had nothing to do with ethnicity (i.e., neither Kishaba's race, nor Stimmel's race was relevant) (Mollicone Depo. at 80). Finally, Mollicone testified that McDonough did not belittle or demean employees because of their race, but rather belittled and demeaned everybody including Mollicone, without regard to race. Thus, Mollicone testified:

A. To know Earl McDonough is to love him. He treated everyone like a piece of shit.

Q. Regardless of their race?

A. Correct. He didn't discriminate that way. He did not discriminate that way. He did not discriminate when it came to belittling people, no. He belittled everyone when he had the opportunity to. When the opportunity was there, he belittled them. So he didn't discriminate that way, no. It didn't matter what race you were.

Q. I believe that, now that I look at my notes from earlier your testimony was something about that was his style of management.

A. Correct, intimidation.

Q. He belittled and intimidated everyone regardless of race or religion?

A. Not everyone. It might be me this week, and it might be you next week.

Q. And it didn't make a difference what your race was or what your national origin was?

A. Correct, correct.

(Mollicone Depo. at 101–102).

*The Jamie Guerrero Testimony.* Kishaba also offered deposition testimony of

**572**

Guerrero, the Employment Manager in the Human Resources Department when Leong resigned. Guerrero told Isenberg, then Director of Human Resources, that she was interested in applying for Leong's former position as Director of Personnel. According to Guerrero, Isenberg did not believe Guerrero was qualified for the position and would not recommend her to management. Guerrero persisted, however, and Isenberg finally agreed to inform "upstairs" of Guerrero's interest in the job and Isenberg's reservations. Guerrero testified that a few days later, Isenberg informed her that she reported Guerrero's interest in Leong's former job "upstairs," and that "they" decided not to select her because "they" preferred someone who was local and local-looking. There was no testimony as to whom Isenberg referred when she told Guerrero that she would "check upstairs," nor to whom she was referring when she allegedly told Guerrero that "they preferred someone who was local and local looking.

34. Finally, Kishaba offered statistical evidence in the form of Professor Daniel Rubenfeld's expert opinion of statistical discrimination by Hilton in the hiring of its officials and managers between 1980 and 1988. Rubenfeld based his opinion on general population statistics and assumed that all Hawaii residents over age sixteen constituted the eligible applicant force for official and manager positions at the Village. After determining that the percentage of Caucasian officials and managers at the Village between 1980 and 1988 exceeded the percentage of Caucasians in the general population, Rubenfeld concluded that there was statistical discrimination in the sense that Caucasians constituted a greater percentage of the Village's officials and managers than the general population workforce. The analysis and conclusions were based on an assumption that the Village reported Kishaba in the Officials and Managers category rather than Office Clerical category in its annual EEOC report. The record shows, however, that Hilton included Kishaba in the Office Clerical, and not the Officials and Managers category so

that Professor Rubenfeld's analysis and opinion does not reflect Kishaba at all.

Nor does Professor Rubenfeld's report consider who made the hiring decisions about which he has opined. Since the officials and managers category includes all management officials and the record in this action shows that McDonough is only involved in senior management hiring decisions, no conclusion can be drawn regarding McDonough's motivations vis-a-vis Kishaba from Professor Rubenfeld's limited analysis and opinion. In addition, Rubenfeld's report shows that between McDonough's 1984 arrival and his 1988 departure, the percentage of Caucasian officials and managers as compared to the total number of officials and managers was virtually unchanged. There were only 0.058% more Caucasian officials and managers in the work force in 1988 than there were in 1984 (PX 85, exhibit E). Accordingly, Rubenfeld's report is of no probative value in this case.

35. Kishaba's co-workers, Stratton, Anderson, Stimmel, Inamine, and Strom all testified at length regarding Kishaba's allegations of disparate treatment. Kishaba was unable to present any corroborating testimony from her co-workers of race discrimination. Instead, they all corroborated McDonough's testimony about the Executive Office's disarray and Kishaba's failure to keep up with McDonough's workload, especially his filing and dictation. They also corroborated McDonough's testimony that his use of the term "you people" *was* generic and referred to all the Executive Staff when he expressed frustration over the continued backlogs in his filing and dictation.

Anderson, Stimmel, Strom and Inamine also corroborated McDonough's testimony about Kishaba's emotional instability and excessive sensitivity, and frequent tears in response to various statements and events in the office. Even the court took note of the fact that Kishaba cried on two occasions during her rebuttal testimony and on several occasions during her direct testimony. Strom testified about Kishaba's excessive sensitivity in describing an episode in

which Kishaba persuaded McDonough to have Strom hold off working on a new filing system and give Kishaba another chance to solve the problem herself by tearfully pleading with McDonough to give her one more chance to clean up the files. Similarly, McDonough testified about Kishaba's apparent extreme sensitivity during her travel to the mainland in 1985. McDonough made arrangements with several hotels on the mainland for special treatment of Kishaba during Kishaba's first trip out of state. When Kishaba returned from the trip, she complained to McDonough about the rudeness of employees at the San Francisco Hilton and the inhospitable treatment (being seated near the kitchen) at a restaurant in Phoenix. Kishaba attributed the poor treatment in both instances to what she perceived as discrimination based on her race.

36. Stratton, Anderson, Inamine, Stimmel, and Strom also corroborated McDonough's testimony that he treated all the Executive Office employees the same, except that Stratton, Anderson, and Strom, citing several examples, testified they believed McDonough actually favored Kishaba and protected her against any criticism from other employees. For example, Stratton testified that when she requested extra help because of Kishaba's refusal to help her or allow her assistants to help Stratton, McDonough refused her request but promptly hired additional help for Kishaba when she requested additional help. Anderson and Stratton also testified that whenever they presented legitimate criticism of Kishaba's work performance and adamant refusal to overhaul the filing system, McDonough always responded that the two had to learn to get along with Kishaba or leave.

Baird corroborated the testimony of Stratton and Anderson that despite their criticisms of Kishaba, McDonough fully supported Kishaba when he met with Anderson, Stratton, and Baird and told Stratton and Anderson that they either had to learn to live with Kishaba or leave. Even Kishaba admitted that Stratton told her that McDonough had fully supported

Kishaba during the February 4, 1986 meeting.

Anderson and Strom described other examples of McDonough's favoritism and protectiveness of Kishaba including McDonough's subsequent decision to reassign Anderson to serve under Kishaba despite previously assenting to Anderson's demand that she report directly to McDonough and McDonough's request that Strom hold off reorganizing the filing system after Kishaba had tearfully asked for another chance to resolve the filing problems.

Although neither Stimmel nor Inamine believed that McDonough favored or treated Kishaba better, they, both insisted that McDonough treated all of them the same. According to Inamine and Stimmel, McDonough was "sharp" with all of them and used an angry or frustrated tone of voice whenever anyone made a mistake. Stimmel testified that she would have resigned if McDonough treated her the way Kishaba represented to Stimmel he had treated Kishaba and if Stimmel became as upset and unhappy as Kishaba seemed to be, because no one likes to be so unhappy at her job. However, Stimmel further testified that she did not observe any action or statement by McDonough to Kishaba which would trigger such unhappiness, nor did Stimmel have any knowledge of what might have justified Kishaba's unhappiness. Stimmel testified that McDonough treated her the same way he treated Kishaba, but she did not feel it was intolerable and did not quit. After working for a few months, Stimmel began making mistakes and McDonough spoke to her in the same angry and frustrated tone of voice which she had heard him use with Kishaba when she made mistakes. Yet, Stimmel did not resign because of McDonough's frustration or anger with her mistakes, because she did not believe McDonough's treatment was intolerable. The Court finds that, contrary to Kishaba's representation to Stimmel, McDonough did not treat Kishaba in an intolerable or discriminatory manner, and that Kishaba reacted to McDonough's treatment of her in a supersensitive manner and not as a reasonable person would have reacted. Stimmel and Inamine also testified that, like

Kishaba, they were required to take dictation from McDonough, two secretaries at a time. McDonough also asked Stimmel in front of other secretaries where she planned to file documents which he had dictated. Finally, Stimmel, Inamine, Strom, Stratton, and Anderson all testified that they never heard McDonough make any racially derogatory statements about Kishaba or her Asian ancestry, nor did they ever observe any conduct by McDonough towards Kishaba which was racially discriminatory.

37. Although McDonough criticized Kishaba and other secretaries from time to time for errors in his files, dictation and calendar, he thought highly of Kishaba, as shown by his gift of Skipper, a pet parrot valued at over $600, to Kishaba; his special request that Kishaba lunch with his wife on his wife's birthday; his Christmas gifts to Kishaba but not other secretaries; his generous wage raises for Kishaba; his request that Kishaba greet his brother-in-law on his arrival in Hawaii; and his frequenting Kishaba's hula show.

38. The Court finds, in viewing the demeanor and hearing the testimony of all witnesses, as well as in considering the other evidence presented by the parties, that the testimony of plaintiff and her witnesses is not as credible as that of Defendants and their witnesses. The Court's demeanor and credibility finding is reflected in the foregoing findings of fact.

### III. CONCLUSIONS OF LAW

1. If any conclusions of law are later determined to be findings of fact, they shall be so characterized, notwithstanding their inclusion here as conclusions of law.

2. This Court has personal and subject matter jurisdiction over Kishaba's Title VII claim. Venue properly lies in this Court under 28 U.S.C. §§ 1331 and 1391 and 42 U.S.C. § 2000e–5(f).

3. 42 U.S.C. § 2000e–2(a) states in relevant part:

It shall be an unlawful employment practice for an employer—

\*　　\*　　\*　　\*　　\*　　\*

(1) to ... discriminate against any individual with respect to his ... terms, conditions, or privileges of employment *because of* such individual's race....

4. In order to prevail on her Title VII constructive discharge claim against Defendants, Kishaba must prove by a preponderance of the evidence both race discrimination *and* a continuous pattern of conduct that rendered her work environment so intolerable and discriminatory that a reasonable person in the same position would have felt that she was forced to quit. *Watson v. Nationwide Insurance Co.*, 823 F.2d 360, 361 (9th Cir. 1987) (*"Watson"*); *Satterwhite v. Smith*, 744 F.2d 1380, 1381–2 (9th Cir.1984) (*"Satterwhite"*). Defendant Hilton may be held responsible for any constructive discharge of Kishaba by McDonough that violates Title VII under the doctrine of respondeat superior. *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1514–5 (9th Cir.1989); *Staton v. Maries County*, 868 F.2d 996, 998 (8th Cir. 1989); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315–18 (11th Cir. 1989), *reh'g denied*, 874 F.2d 821 (11th Cir.1989). Since the Court concludes that Kishaba was not discriminated against because of her Asian ancestry, further discussion of the respondeat superior principle is unnecessary.

5. Under a Title VII constructive discharge claim, it is not enough to simply prove race discrimination. Kishaba must show that the race discrimination was severe enough to render her work environment intolerable to a reasonable person. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–7, 106 S.Ct. 2399, 2405–6, 91 L.Ed.2d 49 (1986) (*"Vinson"*); *Watson*, 823 F.2d at 361; *Satterwhite*, 744 F.2d at 1381–2; *Grant v. Morgan Guaranty Trust Co. of New York*, 638 F.Supp. 1528, 1538–9 (S.D.N.Y.1986). As the Supreme Court cautioned in *Vinson:*

Of course, as the courts in both *Rogers* and *Henson* recognized, not all workplace conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment within the meaning of Title VII. See *Rogers v.*

*EEOC, supra,* at 238 ("mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to sufficiently significant degree to violate Title VII); *Henson,* 682 F.2d, at 904 (quoting same). For sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." *Ibid.* Respondent's allegations in this case—which include not only pervasive harassment but also criminal conduct of the most serious nature—are plainly sufficient to state a claim for "hostile environment" sexual harassment.

477 U.S. at 67, 106 S.Ct. at 2405–6.

Although *Vinson* was a sexual harassment case, the principles underlying a hostile environment theory are equally applicable in sexual and racial harassment cases.

6. The standard for measuring the alleged discriminatory and intolerable conduct is an objective one based on a reasonable person's reaction to the statement and conduct to which Kishaba was exposed and not Kishaba's subjective reaction to such events. *Watson,* 823 F.2d at 361; *Schuler v. Chronicle Broadcasting Co.,* 793 F.2d 1010, 1011 (9th Cir.1986); *Bodnar v. Synpol,* 843 F.2d 190, 194 (5th Cir.1988) (*"Bodnar"*).

7. Kishaba seeks to prove the discrimination element of her constructive discharge claim under the disparate treatment model. The determinative factual inquiry in every Title VII disparate treatment claim is whether the defendant intentionally discriminated against the plaintiff; i.e., *whether* the employer treated some persons less favorably than others because of their race. *United States Postal Service v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983) (*"Aikens"*).

8. Kishaba may meet her burden of proof under the disparate treatment model by offering either direct or indirect evidence. *Aikens,* 460 U.S. at 714, n. 3, 103 S.Ct. at 1481, n. 3; *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253,

101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) (*"Burdine"*); and *Pejic v. Hughes Helicopter, Inc.,* 840 F.2d 667, 672 (9th Cir.1988). Direct evidence is evidence which is directly probative of discrimination, as opposed to indirect or circumstantial evidence which requires a further inference by the Court that otherwise neutral or ambiguous statements referred to the Plaintiff's race in a derogatory manner. *Young v. General Foods Corp.,* 840 F.2d 825, 829 (11th Cir.1988), *cert. denied,* 488 U.S. ——, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989); Black's Law Dictionary at 221, 413–14 (5th ed., 1979).

9. Kishaba has not presented any direct evidence of discrimination by McDonough based on her Asian race. There is no evidence of a racial slur made by McDonough directly to or about Kishaba. Nor is there evidence of any statement by McDonough that he hired Stimmel or treated Kishaba less favorably than Stimmel because of Kishaba's Asian race. No witness corroborates Kishaba's claim of direct evidence of discrimination. Even Baird and Mollicone deny any knowledge of race discrimination in the hiring of Stimmel and McDonough's treatment of Stimmel and Kishaba.

10. The judicial decisions cited by Kishaba for direct evidence of discrimination involve instances where explicit racial slurs were made about the plaintiff regarding employment action taken against the plaintiff. *See generally Wilson v. City of Aliceville,* 779 F.2d 631 (11th Cir.1986) (Mayor's statement that he would not allow federal government to force him to hire "a Goddamned nigger" as the reason for not hiring black applicant for job of sheriff (*"Wilson"*)); *Miles v. M.N.C. Corp.,* 750 F.2d 867 (11th Cir.1985) (Employee's statement that Company did not hire any blacks because "half of them weren't worth a shit"). There is no similar direct evidence of any explicit racial slur by McDonough about Kishaba. Nor has Kishaba presented evidence of any statement by McDonough that he criticized Kishaba or hired Stimmel or treated Kishaba less favorably than any non-Asian secretary because of Kishaba's race. To the contrary, even

Baird and Mollicone, on whom Kishaba places great emphasis were unable to corroborate Kishaba's claim of race discrimination. Baird not only was unaware of any such discrimination, but he actually testified that McDonough supported Kishaba when she was criticized by Stratton and Anderson. While Baird testified that McDonough expressed some stereotypical views of local people generally, Baird also testified that McDonough did not discriminate on any prohibited basis against any person in his actual employment decisions.

Similarly, Mollicone testified that neither Kishaba's or Stimmel's race played any part in Stimmel's hire. Instead, Stimmel was hired because Kishaba could not cope with the workload alone. Mollicone also denied that McDonough subjected employees to demeaning and abusive work conditions because of their race. According to Mollicone, McDonough demeaned and abused everyone without regard to the person's race; it was just McDonough's management style.

Moreover, the alleged discriminatory conduct of McDonough cited by Kishaba, even if credited, is too ambiguous and/or referred to other persons including non-Asians (e.g., the "you people," Hula, Guy Buffet, accent and hairdo statements, D'Rovencourt, Strom, Stone, Andre Vonarb and Chang) to constitute direct evidence of race discrimination against Kishaba.

For example, the "you people" statements on their face are neither derogatory, nor to Kishaba alone. The statements arose in the context of work that was not completed correctly or changes in management style, and do not single out any particular race. Anderson, Stratton, Stimmel, Strom, and Inamine all testified that McDonough made the "you people" statements to the entire staff and not any particular racial group. And Kishaba stated in her deposition that she understood "you people" to simply mean people in Hawaii. Thus, the Court cannot attribute a racially discriminatory motive to these statements.

Likewise, the "Guy Buffet", hula, accent, and hairdo incidents do not on their face evidence an unlawful racial motive. And,

Stimmel denied the "Guy Buffet" incident ever occurred. Kishaba's original version of the hula incident made in her EEOC statement immediately after she resigned and therefore more credible, simply acknowledges the fact that McDonough had a secretary who teaches the hula. See Jordan v. Clark, 847 F.2d 1368, 1375 (9th Cir.1988), cert. denied, —— U.S. ——, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989) (Factual allegations described by the plaintiff for the first time at trial were not found credible because they were not mentioned in the administrative proceedings which reviewed her claim of sex harassment); cf. Hollcroft v. Dept. of Treasury, I.R.S., 687 F.Supp. 510 (E.D.Cal.1988).

The hula statement does not inherently demonstrate race discrimination as must be the case if the alleged evidence is to be characterized as direct evidence. Likewise, McDonough's alleged casual inquiry about Kishaba's accent is too ambiguous to constitute direct evidence of race discrimination. The Court cannot conclude that such a casual and ambiguous inquiry invariably implicates race discrimination. Finally, the exchange between McDonough and Kishaba regarding her hairdo, which Kishaba admittedly treated as a joke and was not tied to any specific employment action is also too casual and isolated a remark to constitute direct evidence that McDonough's hire of Stimmel or treatment of Kishaba and Stimmel several months later was motivated by race discrimination. Casual, isolated and joking remarks even of a racial nature do not violate Title VII; nor do unreasonable, sensitive reactions to them establish an intolerable work environment. Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir.1981) ("Bunny Bread"); Irving v. Dubuque Packing Co., 689 F.2d 170, 172 (10th Cir.1982) ("Irving"); Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255–6 (4th Cir.1985); Cariddi v. Kansas City Chiefs Football Club, Inc., 568 F.2d 87, 88 (8th Cir.1977) ("Cariddi"). Thus, the Court concludes that Kishaba has not presented any direct evidence of racial discrimination by Defendants.

11. Even assuming arguendo, that any part of Kishaba's evidence might be construed as direct evidence of discrimination, such discrimination was not a motivating factor underlying McDonough's treatment of Kishaba in any respect. Defendants' evidence, including the testimony of Stratton, Strom, Inamine, Stimmel, and Anderson, rebuts any direct evidence of discrimination by showing that McDonough would have taken the same action or made the same decisions regarding Kishaba even in the absence of any impermissible race discrimination.

Thus, even if this Court were to reject the clear mandate of the United States Supreme Court for Title VII analysis, as articulated in *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (*"McDonnell–Douglas"*) and its progeny, as well as clear Ninth Circuit precedent as stated in *Gay v. Waiters and Dairy Lunchmen's Union,* 694 F.2d 531, 538 (9th Cir.1982), and adopt either the *Wilson* modification or the model articulated by Justice O'Connor in *Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989) (*"Price Waterhouse"*), plaintiff would still have failed to establish Title VII liability for Defendants. This is so because it is the conclusion of this Court that Defendants have successfully rebutted any possible presumption of racial discrimination, whether established by direct or indirect evidence, by proving by a preponderance of the evidence that they would have taken any employment-related action that they implemented regarding Kishaba even absent the alleged impermissive motive. This Court reaches the same conclusion as found in *Fragante, i.e.,* "we have not been able to find even a hint of a mixed motive such as existed in *Price Waterhouse.* Instead, it appears that defendants were motivated exclusively by reasonable business necessity." *Fragante v. City and County of Honolulu,* 888 F.2d 591, 598 (9th Cir. 1989).

12. Kishaba has also failed to prove her disparate treatment claim under the indirect or circumstantial evidentiary model first announced in *McDonnell–Douglas,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25, and *Burdine,* 450 U.S. at 252–5, 101 S.Ct. at 1093–5; and more recently refined for a hostile work environment claim in *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405–06.

13. Plaintiff has not presented any evidence, direct or indirect, of harassment against her by Defendants that was motivated by race discrimination. Plaintiff has not even met her initial burden of demonstrating any level of employment discrimination on the part of Defendants. On the contrary, corroborated evidence has been heard by this Court in support of finding that McDonough actually discriminated *in favor* of Plaintiff rather than to her detriment. For example, Kishaba was paid more than Stimmel yet both performed essentially the same duties; McDonough gave Kishaba excellent job performance reviews; McDonough never disciplined Kishaba and even offered her a management position at the same pay rate after Kishaba resigned; McDonough went to great lengths to help Kishaba succeed at her job including hiring more staff, hiring part-time regular assistants for Kishaba, to help her but refusing to provide the same help for Stratton; McDonough acceded to Kishaba's tearful requests to have Anderson report to her and Strom to hold off on changing the filing system; McDonough used the same angry, frustrated tone of voice and "you people" terminology with Stimmel, Anderson and Stratton when he was angry or frustrated with their job performance; McDonough supported Kishaba when her performance was criticized by her two white co-workers, Anderson and Stratton; and McDonough even gave Kishaba a raise exceeding corporate guidelines while refusing to do so for Stratton.

Moreover, there have been presented to this Court no "aggravating factors" of any kind and certainly none that would rise to the level of the factors that existed in *Wakefield v. NLRB,* 779 F.2d 1437 (9th Cir.1986) (*"Wakefield"*); *Satterwhite,* 744 F.2d at 1381–82; *Nolan v. Cleland,* 686 F.2d 806, 813–14 (9th Cir.1982) (*"Nolan"*); *Watson,* 823 F.2d at 361–62; *Ford v. Alfaro,* 785 F.2d 835, 841–42 (9th Cir.1986) (*"Ford"*).

14. Similarly, McDonough's hiring of Stimmel as an Executive Secretary does not, without more, constitute evidence of race discrimination against Kishaba. It is undisputed that the workload in the Executive Office had increased over the years due to the opening of new hotels, the implementation of the Master Plan and McDonough's "hands on" style of management. It is also undisputed that this increased workload caused all of the secretaries, including Kishaba, to work overtime in an effort to keep up with the work. And, it is undisputed that Kishaba had difficulty keeping abreast of the dictation, filing, and scheduling of appointments. At trial, McDonough testified that he hired Stimmel in order to ease Kishaba's workload and to help the office function more smoothly. As such, McDonough had a legitimate nondiscriminatory reason for hiring Stimmel which was not rebutted at trial.

15. There is also no evidence McDonough's alleged harassment was sufficiently pervasive to alter her working conditions to the extent that a reasonable person would have felt that she was forced to quit because of · intolerable and discriminatory working conditions. *Watson*, 823 F.2d at 361. To the contrary, Kishaba testified that she continued working despite the alleged instances of harassment cited by her and decided to quit only after she saw her file in McDonough's office and erroneously concluded that he was planning to fire her. Thus, even assuming that McDonough's alleged harassment may have "engendered offensive feelings", *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting with approval, *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971) ("*Rogers* ")), Kishaba performed her job duties well enough to receive an outstanding job performance review and a substantial salary increase. It was not McDonough's alleged harassment that triggered Kishaba's resignation, but instead, her mistaken belief that he was planning to fire her. Such excessive sensitivity is an unreasonable reaction to an ambiguous workday event (i.e., her personnel file on McDonough's desk) and undermines Kishaba's claim that a reasonable person would

have resigned upon seeing her personnel file on McDonough's desk.

16. The inadequacy of Kishaba's evidence is best illustrated by a brief comparison with the material facts in *Watson* and *Satterwhite*. In *Watson*, the Court identified the following conduct as evidence of an unlawful constructive discharge:

> In this case, we assume, as did the district court, that Nationwide subjected Watson to differential treatment (1) by issuing notice of a potential relative rule violation to Watson in mid-June 1984 but not to other similarity situated employees, (2) by conspiring to create trumped up charges of inadequate job performance while she was on her honeymoon in early July 1984, and (3) by subjecting her to abusive treatment and harassment for several days upon her return to work in mid-July 1984. In particular, we note the evidence in the record, *inter alia*, that Watson had previously always received excellent employment ratings, including one on the day she departed for her wedding and honeymoon; that on her return a company manager told Watson in a four-hour meeting in which she cried constantly that she was a poor and incompetent supervisor; that a manager transferred supervisory duties away from her and told her to go home; and that a personnel manager told her that she was considered a bitch and that she could either resign or be demoted to a position in which she would be supervised by her subordinate trainees.

823 F.2d at 361–362.

Here, Kishaba has not produced any evidence that McDonough: (1) disciplined her at all, much less for violations that were also committed by caucasian employees whom he did not discipline; (2) created false charges of inadequate job performance; or (3) subjected her to abusive treatment by falsely lowering her performance ratings, using obscene language and demoting her to a position in which she would be supervised by her former subordinates. To the contrary, the record evidence shows that McDonough: (1) gave Kishaba excellent performance reviews and substantial

salary increases; (2) did not demote Kishaba; (3) hired Stimmel to share equally in Kishaba's increased responsibilities and duties, while retaining Kishaba as the senior secretary in charge of the Executive Staff; (4) did not utter any racial slurs to or about Kishaba; and (5) replaced Kishaba with another Asian person, Janet Matsuko.

Similarly, in *Satterwhite*, the Court found that:

> Satterwhite faced very poor working conditions. For example, he could not obtain a promotion to the permanent sweeper crew. This prevented him from gaining access to training and advancement opportunities that the Port had promised. Moreover, the Port regularly promoted white men ahead of him. Sometimes Satterwhite even had to train these men, a situation he found embarrassing and humiliating. Furthermore, the reason the Port offered for denying Satterwhite a promotion—that he lack railroad experience—turned out to be a pretext for discriminating against him because he was black. Finally, his supervisor relegated him to working a disproportionate time in the rope room, where he was assigned the dull task of tying ropes. From this post, Satterwhite had virtually no hope of securing the opportunities for career advancement that white men on the permanent sweeper crew had. Instead, he was doomed to remain a temporary employee.

> In light of these facts, as well as the atmosphere of occasional racial insults that all blacks working at the Port suffered, we conclude that the district court did not err in assuming that conditions at the Port were intolerable and discriminatory.

744 F.2d at 1383.

Again, there is no evidence here of comparable abusive discriminatory conduct by McDonough against Kishaba. For example, unlike *Satterwhite*, Kishaba was not kept in a temporary position and denied promotion to a regular position, Kishaba was never denied access to training, Caucasian employees were not promoted above

her and Kishaba was not subject to racial slurs about her Asian race.

17. There is simply no probative evidence here of abusive discriminatory treatment like that found in *Watson* and *Satterwhite*. Indeed, the decisions in *Bodnar*, 843 F.2d at 194; *Irving*, 689 F.2d at 173–74; *Bunny Bread*, 646 F.2d at 1256; and *Bristow*, 770 F.2d at 1255–56; are clearly more comparable to this case. In *Bodnar*, the court ruled that "vague and subjective impressions of threats are too insubstantial a reed, in the absence of objective factors or actions suggesting age discrimination to withstand a defense motion for summary judgment in a constructive discharge action." *Bodnar*, 843 F.2d at 194.

Similarly, in *Irving*, 689 F.2d at 174, the Court found that:

> The conditions that Irving points to as constituting intolerable working conditions appeared to have been imposed in a racially neutral manner, i.e., both black and white supervisors were passed up for raises in December, 1977; Cantrell yelled at everybody.

In *Bunny Bread*, 646 F.2d at 1256, the court rejected the black plaintiff's Title VII constructive discharge claim because the evidence showed that all employees were treated equally harshly. Instead the court concluded, as this Court may concerning McDonough, that "[t]he supervisors at Bunny Bread were very demanding of the employees. The district court found that all employees were closely monitored and often dealt with in a harsh manner * * * The fact that all employees were treated identically rebuts any inference that Bunny Bread's handling of White was done with the intention of forcing him to resign."

■ Finally, the court's constructive discharge analysis in *Bristow*, 770 F.2d at 1255–56, is instructive because it demonstrates that a plaintiff's subjective sensitivity to working conditions, albeit harsh ones, that are nevertheless imposed on all employees, is not sufficient to establish a constructive discharge:

> ["]Intolerability of working conditions, as the circuits uniformly recognize, is assessed by the objective standard of

whether a "reasonable person" in the employee's position would have felt compelled to resign. *Goss [v. Exxon Office Systems Co.],* 747 F.2d [885] at 888; *Pena [v. Brattleboro Retreat],* 702 F.2d [322] at 325; *Clark,* 665 F.2d at 1173; *Johnson,* 646 F.2d at 1256; *Bourque,* 617 F.2d at 65; *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir. 1977). "An employee may not be unreasonably sensitive to his working environment." *Johnson,* 646 F.2d at 1256. Thus, the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting."

\* \* \* \* \* \*

Whether or not the employer's rules of financial accountability be thought harsh, Bristow was not singled out for any unique treatment. Having to pay a portion of the accounts, for which Bristow did not consider himself responsible, may have marked the culmination of many minor dissatisfactions in the case of this employee. We cannot, however, conclude that he resigned due to anything other than universal workaday frustrations.

*Bristow,* 770 F.2d at 1255–56.

18. A careful review of the specific instances which Kishaba alleges constitute racial harassment, as opposed to just unpleasant working conditions, fails to disclose any probative evidence of disparate treatment based on her Asian race. Kishaba's obvious unhappiness and loss of self-esteem at sharing her responsibilities and duties with Stimmel, while real and substantial, nevertheless do not prove that McDonough hired Stimmel because of Stimmel's or Kishaba's race or that McDonough's treatment of Kishaba, Stimmel or other secretaries was motivated by Kishaba's Asian race or any discriminatory desire to force Kishaba to resign. Kishaba's own testimony that she resigned because she believed McDonough was going to fire her, rather than because of McDonough's alleged discriminatory treatment of her, not only undermines Kishaba's race discrimination claim, but further underscores the speculative nature of Kishaba's evidence. There is no probative evidence that McDonough had decided to fire her. Indeed, Kishaba knew that McDonough would transfer her to a management position at no loss of salary if she could not handle the workload of her job and actually offered such a position to Kishaba after she submitted her resignation notice.

Kishaba's reliance on *EEOC v. Murphy Motor Freight,* 488 F.Supp. 381 (D.Minn. 1980), for her racially hostile environment claim is misplaced. Under *Murphy* 's two-prong requirement for Title VII liability, a hostile environment exists if first, there are more than a few isolated incidents of harassment which are part of casual conversation, accidental, or sporadic, and second, there is evidence that the employer "failed to take reasonable steps to prevent racial harassment...." (citing, *Croker v. Boeing Co. (Vertol Div.),* 437 F.Supp. 1138, 1191 (E.D.Pa.1977)). *Id.* at 384–85.

Kishaba has not proved the occurrence of a single incident that would rise to the level of the "vicious, frequent, and reprehensible instances of racial harassment". *Id.* at 384–5. More important, Kishaba failed to establish the existence of any objective racially offensive statement or conduct either directed at herself or that occurred in her presence. Nor has Kishaba established, as required by *Vinson,* some nexus between alleged improper conduct and a term, condition, or privilege of employment.

The Supreme Court requires a nexus between alleged improper conduct and a term, condition, or privilege of employment. The Court stated:

Of course, ... not all workplace conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment within the meaning of Title VII.

*Vinson*, 447 U.S. at 67, 106 S.Ct. at 2405. The "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not sufficiently affect the conditions of employment to violate Title VII. *Rogers*, 454 F.2d at 238, *quoted with approval in, Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405–6; *see also Cariddi*, 568 F.2d 87, 88 (holding that employer's occasional reference to plaintiff as "dago" and other Italian–American employees as the "Mafia," constituted isolated or sporadic derogatory ethnic comments as part of casual conversation that did not rise to level necessary for violation of Title VII). For racial harassment to be actionable under Title VII, "it must be sufficiently severe or pervasive 'to alter the conditions of [the claimant's] employment and create an abusive working environment.'" *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir.1982)).

19. Based upon the record evidence summarized above, Kishaba has shown by a preponderance of the evidence that she is a member of a protected racial group—employees of Asian ancestry. Kishaba has not shown, however, that she was subjected to different or abusive working conditions because of her Asian race. The Court concludes based on the consistent corroborating testimony of Stratton, Anderson, Stimmel, Inamine, and Strom, that Kishaba was not treated differently from other non-Asian employees of the Executive Office because of her race. Rather, the evidence shows that McDonough treated all of the members of the Executive Staff the same and without regard to race. The Court concludes that the allegedly "racial" remarks attributed to McDonough by Kishaba (many of which were not asserted in Kishaba's nearly contemporaneous sworn statement to the EEOC and letter to Barron Hilton or in her later sworn Affidavit and deposition), even if credited, are too ambiguous, referred to other employees including non-Asian employees, were casual, joking remarks and were largely removed in time and context from Kishaba's resignation. Therefore, these remarks do not prove that McDonough's decision to hire Stimmel or his treatment of Stimmel vis-a-vis Kishaba amounted to unlawful racial discrimination. Significantly, even after Kishaba resigned, McDonough tried to persuade her to return to Hilton by offering her an Assistant Manager's position with no reduction of pay, and if that offer was not acceptable, agreeing to allow her to continue her employment (PX 35). When Kishaba refused to return McDonough replaced her with another secretary who was also of Asian ancestry. Thus, the Court concludes that Kishaba has failed to prove that she was discriminated against by Defendants in violation of Title VII.

20. The Court also concludes that Kishaba was not constructively discharged from her employment with Hilton. Kishaba has failed to prove by a preponderance of the evidence that any term, condition or privilege of her employment at Hilton, was altered by any racially discriminatory treatment. To the contrary, the Court concludes that a reasonable person would have continued working, despite the alleged conduct of McDonough. (DX 29 at ¶ 19; PX 37 at ¶ 2; PX 39A at ¶ 10).

21. In sum, this Court concludes that Plaintiff's long time and loyal employment with Hilton was tragically ended by Plaintiff's decision to resign as the result of her supersensitivity over the hiring of a second secretary to service McDonough, for which there were legitimate, non-discriminatory business reasons, and in her mistaken belief that McDonough had pulled her file in furtherance of some plan to fire her. Kishaba has not met her initial burden of demonstrating any level of employment discrimination on the part of Defendants. On the contrary, corroborated evidence has been heard by this Court in support of finding that McDonough actually discrimi-

nated *in favor* of Kishaba rather than to her detriment. Moreover, there have been presented to this Court no "aggravating factors" of any kind and certainly none that would rise to the level of the factors that existed in *Wakefield,* 779 F.2d at 1438; *Satterwhite,* 744 F.2d at 1381–82; *Nolan,* 686 F.2d at 813–14; *Watson,* 823 F.2d at 361–62; *Ford,* 785 F.2d at 841–42. Accordingly, this Court holds that Kishaba was not constructively discharged from her employment. Kishaba did not establish the existence of a racially hostile environment involving Title VII liability; and Kishaba did not establish a pattern or practice of racially premised disparate treatment. *International Broth. of Teamsters v. United States,* 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854–55, n. 15, 52 L.Ed.2d 396 (1977).

Section 706(k), 42 U.S.C. § 2000e–5(k) provides that a court may award attorney's fees to the prevailing party in a Title VII action. Payment of attorney's fees, however, lies within the sound discretion of the district court and should be awarded only where the plaintiff's case was so meritless and vexatious as to warrant such payment. As the Supreme Court stated in *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421–22, 98 S.Ct. 694, 700–01, 54 L.Ed.2d 648 (1978):

> [A] district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith. * * * Hence, a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so. And, needless to say, if a plaintiff is found to have brought or continued such a claim in *bad faith,* there will be an even stronger basis for charging him with the attorney's fees incurred by the defense.

Although it is held herein that Kishaba failed to establish Title VII liability on the part of either Hilton or McDonough, this Court does not conclude that Kishaba's action was frivolous, unreasonable, without foundation, or that it was brought in bad faith. Accordingly, Defendant's request for an award of attorney's fees is hereby denied.

## IV. ORDER

Based on the foregoing Findings of Fact and Conclusions of Law and the Decision of this Court dated February 16, 1990, it is hereby Ordered, that Judgment enter in favor of Defendants Hilton and McDonough dismissing with prejudice, Plaintiff's Title VII claim against Hilton and McDonough.